**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 10-2124

STATIA SCOTT,

Plaintiff - Appellee,

v.

EATON CORPORATION LONG TERM DISABILITY PLAN,

Defendant - Appellant.

Appeal from the United States District Court for the District of
South Carolina, at Anderson.   Henry  M.  Herlong,  Jr.,  Senior
District Judge.   (8:09-cv-02572-HMH)

Argued:  October 27, 2011        Decided:  November 21, 2011

Before MOTZ, KING, and DUNCAN, Circuit Judges.

Reversed by unpublished per curiam opinion.

**ARGUED:** Anna  K.  Raske,  BENESCH,  FRIEDLANDER,  COPLAN  &  ARONOFF,
LLP, Cleveland, Ohio, for Appellant.   Robert  Edward  Hoskins,
FOSTER LAW FIRM, LLP, Greenville, South Carolina, for Appellee.
**ON BRIEF:** Jeffrey  D.  Zimon,  BENESCH,  FRIEDLANDER,  COPLAN  &
ARONOFF, LLP, Cleveland, Ohio, for Appellant.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This case arises from the revocation by appellant Eaton Corporation Long Term Disability Plan ("Eaton") of long-term disability ("LTD") benefits provided to appellee Statia Scott. The district court reversed Eaton's decision and awarded LTD benefits to Scott. Because we find that Eaton's decision was not an abuse of discretion, we reverse.

I.

A.

Eaton is the administrator of a LTD benefit plan for the employees of Eaton Corporation, a manufacturer of, inter alia, electrical components. Benefits are funded by premiums paid by the employees and by contributions from Eaton Corporation's general assets. This LTD plan is a "welfare plan" governed by the Employee Retirement Income Security Act ("ERISA"). ERISA § 3(1). Eaton is the plan administrator and has discretion to interpret and apply its provisions. Eaton has delegated claims administration to Sedgwick Claims Management Service, Inc. ("Sedgwick").

To be eligible for benefits under the plan, a beneficiary must have a covered disability and must be under the continuous care of a physician who verifies the beneficiary's disability to the satisfaction of the claims administrator. As relevant to

2

this appeal, a covered disability is an injury that renders the beneficiary "totally and continuously unable to engage in any occupation or perform any work . . . for which [she is], or may become, reasonably well fit by reason of education, training, or experience." J.A. 67. After an initial determination of eligibility, the claims administrator performs periodic evaluations to revalidate eligibility. The burden is on the beneficiary to show at the initial determination stage and at subsequent revalidations that she is disabled. LTD benefits end on "[t]he first day for which [the beneficiary is] unable to provide satisfactory evidence of a covered disability." J.A. 71. The disability must be shown at all times by "objective findings," i.e., "those that can be observed by [a] physician through objective means, not from [the beneficiary's] description of the symptoms." J.A. 73. In addition, for those claiming to be disabled due to mental illness, they must be under the continuous care of a psychologist or psychiatrist.

B.

Because our review is very fact-dependent, we lay out the history of Scott's disability and treatment in some detail. Eaton Corporation employed Scott for approximately 17 months. In 1998, Scott stopped working because of chronic pain in her right wrist and arm. The chronic pain appears to be the result of a childhood injury that healed improperly and that was

3

aggravated by an injury at work. Eaton initially granted Scott benefits in 1998 based on this right arm pain.

In August 2003, Scott had surgery to address her right arm pain. Two months after surgery, her orthopedist, Dr. Timms, noted "no wrist misalignment," and although Scott complained of crepitus[1] in her wrist, Dr. Timms saw "no real signs of anything going wrong" and opined, "overall things look good." J.A. 437. Three months after surgery, Dr. Timms noted that Scott's wrist had "loosened up nicely;" that she was not experiencing "a lot of pain or swelling;" and that her range of motion was "quite improved." J.A. 442. Five months after surgery, however, Scott complained that the pain in her wrist had returned and that she was experiencing "decreased sensation and shooting pains." J.A. 443. Dr. Timms could not pinpoint the cause of the symptoms, noting that, "she is just having generalized pain. Again, there is no swelling. Incisions are clean. Motion appears to be full." J.A. 444.

Scott's LTD benefits were terminated in 2004 based upon "insufficient documentation of a functional impairment that would preclude [Scott] from the job duties of any occupation." J.A. 119. Scott appealed this termination and Eaton reinstated

---

[1] Crepitus is "a palpable or audible grinding." The Merck Manual of Diagnosis and Therapy 285 (Robert S. Porter et al. eds., 19th ed. 2011).

her benefits after an independent medical evaluation. This independent medical evaluation noted that Scott's symptoms were possibly caused by Reflex Sympathetic Dystrophy ("RSD")[2] secondary to her 2003 surgery.

In 2005, Scott applied for Social Security disability benefits. The Social Security Administration denied Scott benefits because it concluded that she was not disabled.[3] Also in 2005, Scott presented to Dr. Riley--her primary physician-- with swelling in her feet and ankles. Later, a blood test showed elevated levels of Rheumatoid Factor ("RF").[4] Based upon these symptoms and Scott's family history of Rheumatoid Arthritis ("RA"), Dr. Riley suggested that Scott see a rheumatologist. Scott declined. Nevertheless, Dr. Riley eventually diagnosed Scott with RA.

In 2006, as part of a periodic revalidation of her eligibility for benefits, Eaton required Scott to undergo an

---

[2] RSD, also known as "complex regional pain syndrome," is a neurological condition that "typically follows an injury," and is characterized by various degrees of burning pain, excessive sweating, swelling, and sensitivity to touch. The Merck Manual of Diagnosis and Therapy, supra, at 1633-34.

[3] This was Scott's second such denial. Scott was previously denied Social Security disability benefits because she had not yet paid enough into the system to become eligible.

[4] RFs are antibodies that are present in about 70 percent of patients with RA. The Merck Manual of Diagnosis and Therapy, supra, at 333.

independent medical evaluation by a rheumatologist. The rheumatologist, Dr. Stephenson, stated, Scott's "[p]revious diagnosis of RSD and as well as RA are not supported by my examination. . . . I don't think the RA is currently a clinical factor." J.A. 510. Dr. Stephenson also believed Scott was being overmedicated. He concluded that Scott's chronic pain was most likely caused by her depression and anxiety.[5] Nonetheless, Dr. Stephenson believed Scott was totally disabled based on her pain and mental illness.

Revalidation of Scott's disability began again in 2007. As part of this revalidation, Sedgwick asked Scott's treating physicians to complete questionnaires and submit medical notes from recent examinations.

In his medical notes from May 1, 2007, Dr. Riley indicated that Scott's RA symptoms were worsening. Dr. Riley indicated that Scott told him that she has not seen a rheumatologist. It is unclear if Dr. Riley was aware of Dr. Stephenson's examination of Scott in 2006 and his conclusion that Scott was

---

[5] Dr. Stephenson did not discuss Scott's mental illness in-depth. The first indication in the record that Scott suffers from mental illness is a 2004 letter from Dr. Riley noting that Scott suffers from anxiety and is taking Valium. It appears Dr. Riley first prescribed Scott an antidepressant, Lexapro, in January of 2007.

6

not suffering from RA. Dr. Riley also noted that Scott was on pain medication, "which she tries to take sparingly." J.A. 532.[6]

In a questionnaire from Sedgwick completed by Dr. Riley on September 22, 2007, Dr. Riley concluded that Scott was totally disabled due to her anxiety and depression and pain in her right arm. Dr. Riley made no mention of Scott's previous diagnoses of RSD and RA. Dr. Riley also indicated for the first time that the medication Scott was taking made it difficult for her to concentrate.

In medical notes from October 4, 2007, Dr. Riley concluded that Scott "is permanently disabled secondary to" RA and RSD. J.A. 547. Dr. Riley also indicated that Scott had been seeing Dr. Sida, a neurologist, for treatment.

The record shows that Dr. Sida examined Scott multiple times. In notes from Dr. Sida, dated October 3, 2007, he observed that Scott was "alert and oriented" and had "normal language and attention." J.A. 545. Dr. Sida also noted that Scott could perform serial seven calculations[7] and that her memory was normal. X-rays ordered by Dr. Sida indicated that Scott was suffering from "degenerative facet joint arthritis of

---

[6] At the time of the most recent review of her eligibility, Scott was taking Mobic and Percocet.

[7] A test for mental function, where a patient is asked to count down from 100 by sevens.

mild degree . . . and mild osteoarthritis." J.A. 248. In notes from his November 7, 2007, examination of Scott, Dr. Sida stated, he could not "find a neuropathic cause for her persistent pain." J.A. 255. Dr. Sida also noted that Scott "has been told she has rheumatoid arthritis but no one is treating for this." Id.

Between December 13, 2007, and March 25, 2008, it appears from the record that Dr. Riley examined Scott three times. Dr. Riley's medical notes indicate that on December 13, 2007, Scott came "[i]n for follow up on rheumatoid arthritis." J.A. 259. Dr. Riley ordered a blood test, which showed Scott had an elevated RF level.

Scott was examined by Dr. Riley again on March 7, 2008. On an examination sheet under "Assessment:," Dr. Riley wrote, "RSD." J.A. 266. Under "Plan:," Dr. Riley wrote, "Still unable to work." Id. No mention is made of RA. In a Sedgwick questionnaire completed by Dr. Riley on March 17, 2008, he noted for the first time that side effects from Scott's pain medication "interfere[] with her ability to work," J.A. 264, but he did not describe what this interference was or provide objective findings to substantiate such interference.

After her next exam--on March 25, 2008--on an examination sheet under "Assessment:," Dr. Riley wrote, "Rheumatoid arthritis." J.A. 268. On the sheet, Dr. Riley also checked the

8

box next to "edema" and noted that Scott's hands and feet were "puffy."

Sedgwick also asked Dr. Riley to fill out a physical capacity evaluation ("PCE") for Scott. On the PCE, Dr. Riley indicated that Scott was capable of sitting, standing, walking, speaking, and viewing a computer screen for 8 hours a day. Despite this, on the same PCE, Riley concluded that Scott could do zero hours of sedentary work per day. To address this apparent inconsistency, a Sedgwick representative contacted Dr. Riley by phone. The Sedgwick representative reported that Dr. Riley said that Scott was capable of sedentary work.

To summarize, Scott had, at various times, been diagnosed with four potentially disabling conditions, with conflicting evidence as to each. Two doctors had diagnosed Scott with RSD--a neurological condition--but Dr. Stephenson rejected this diagnosis and Scott's treating neurologist, Dr. Sida, could find no neurological cause for her pain. Dr. Riley had diagnosed Scott with RA; however, Dr. Stephenson, a rheumatologist, rejected this diagnosis, and Scott had never seen a rheumatologist for treatment. Two doctors also diagnosed Scott as suffering from mental illness; Scott, however, has never been under the continuous care of a psychologist or psychiatrist, as required by the plan. Dr. Riley also concluded that the side effects from Scott's pain medication would interfere with her

9

ability to work, but no objective findings exist in the record to substantiate such interference. Also, Dr. Riley previously noted that Scott tried to take her medication "sparingly," and Dr. Sida concluded that Scott had normal cognitive functioning. Finally, as to the cumulative effect of Scott's ailments on her ability to work, Dr. Riley came to conflicting conclusions on the PCE and, when asked to clarify, stated that Scott could perform sedentary work.

## C.

Sedgwick submitted the above information along with Scott's medical records to a specialist in internal medicine and rheumatology, Dr. Lumpkins. Dr. Lumpkins, in a July 23, 2008, report, concluded that Scott could perform sedentary work. First, Dr. Lumpkins noted that Scott's primary physician, Dr. Riley, had concluded that Scott could perform sedentary work. Regarding Scott's RSD, Dr. Lumpkins concluded that Scott could perform work so long as it did not entail "repetitive fine motor manipulation." J.A. 575. As to concerns regarding potential side effects of Scott's pain medication, Lumpkin concluded that one medication Scott was taking, Mobic, "would not be expected to influence [Scott's] functional ability in a sedentary . . . work environment." J.A. 578. As to another medication, Percocet, Lumpkin concluded that its side effects would limit Scott from "working at unprotected heights, driving a company

10

vehicle, [and] working with heavy machinery or safety sensitive materials." Id. As to Dr. Riley's diagnosis of RA, Dr. Lumpkins noted that while there was some objective evidence that Scott has some sort of arthritis, it was insufficient to conclude that Scott had RA. Based on Dr. Lumpkins's report, on October 7, 2008, Sedgwick notified Scott that her LTD benefits would cease starting November 1, 2008.

Scott sought review of this decision pursuant to plan procedure on October 25, 2008. On November 7, 2008, Scott provided Sedgwick with a letter from Dr. Riley, dated October 11, 2008, in which he again asserted that Scott was totally disabled and could perform no work. In the letter, Dr. Riley referred to "the side effects of the chronic medication that [Scott] takes," J.A. 552, but did not indicate what those side effects were. The letter contained no objective findings and did not attempt to explain his previous inconsistent conclusions on the PCE or his later statement that Scott could perform sedentary work. Dr. Riley also submitted additional information to Sedgwick in December 2008 and early 2009. This information showed that Dr. Riley had not seen Scott in person from March of 2008 until after Eaton revoked her benefits in October of that year. The information also indicated that in March of 2009, Dr. Riley ordered a bone scan for Scott to check for RA. The bone scan revealed no obvious signs of RA.

11

On review, Sedgwick engaged three physicians (a physical medicine specialist, a psychiatry and neurology specialist, and an internal medicine and rheumatology specialist) to re-evaluate Scott's medical records and speak with Dr. Riley. All three physicians concluded that Scott was able to work. Based on these reports, Sedgwick reaffirmed its original decision.

Scott appealed this decision to Eaton, pursuant to plan procedure. Upon her appeal, Eaton provided her records to three anonymous physicians (a specialist in neurology, a specialist in psychiatry, and a specialist in physical medicine). These physicians all concluded that Scott could work. Eaton denied Scott's appeal on September 28, 2009. J.A. 86. In its denial letter, Eaton noted that the only physician since 2007 to conclude Scott was disabled was Dr. Riley. Eaton discounted Dr. Riley's conclusions based on the various inconsistencies among his diagnoses and his lack of objective findings. Eaton concluded that the weakness of Dr. Riley's conclusions, the dearth of supporting objective evidence, and the unanimous contrary view of the seven reviewing physicians, noted above, was enough to support the original revocation of Scott's LTD benefits.

D.

On October 9, 2009, Scott sued Eaton, seeking reinstatement of her benefits. On February 11, 2010, the district court

12

stayed the action to permit Eaton to review an affidavit by Dr. Riley.[8] Eaton agreed to reconsider its revocation in light of this affidavit. After review of the affidavit, the same anonymous reviewing physicians who previously concluded Scott could work again came to the same conclusion. Based on this, Eaton sustained the revocation. As to Dr. Riley's assertion that Scott's medication will prevent her from working, Eaton noted:

> [A]lthough Dr. Riley expresses concern with respect to Ms. Scott's ability to perform sedentary work, given the medications she uses, his office notes and records do not evidence the cognitive changes that he told the independent physician reviewer may impact her functional capacity.

J.A. 97.

The parties then moved for judgment pursuant to the district court's "Specialized Case Management Order for ERISA benefits cases." J.A. 1249. The district court found Eaton had abused its discretion in two ways. First, the district court concluded that Eaton acted unreasonably when, on review of its initial determination, it failed to give adequate weight to Dr. Riley's letter of October, 17, 2008: "Instead of meaningfully

_____

[8] The affidavit was undated and not notarized, but appears to be from sometime in 2009. Scott's subjective complaints were listed and Riley averred that Scott's "subjective complaints and limitations are consistent with her objectively diagnosed medical conditions," J.A. 598, but the affidavit listed no objective findings. Scott's medical conditions were noted as RSD and RA.

13

discussing the impact that Dr. Riley's subsequent letter had on the conclusion that Scott could perform sedentary work, Eaton turned to hired peer reviewers in an attempt to reconcile its initial determination that Scott no longer had a covered disability." J.A. 1257-58. Second, the district court concluded that Eaton violated terms of the plan when it "failed to adequately address the impact of Scott's medication regime on her ability to work." J.A. 1259. The district court stated: "Eaton's reviewers collectively failed to evaluate and consider the disabling side effects of Scott's narcotic medication. By failing to consider the side effects of Scott's pain medication, the Plan Administrator and its reviewers have disregarded the terms of the Plan." J.A. 1261-62. The district court accordingly reversed Eaton's revocation and awarded Scott LTD benefits. Eaton appealed.

## II.

On appeal, Eaton argues that the district court erred when it reversed Eaton's decision to end Scott's LTD benefits, because Eaton's decision-making process was sound and its ultimate decision was supported by substantial evidence. We agree.

Because the LTD plan granted Eaton discretionary authority to determine eligibility for benefits, "the exercise of assigned

14

discretion is reviewed for abuse of discretion." Evans v. Eaton Corp. LTD Plan, 514 F.3d 315, 321 (4th Cir. 2008). "[T]he district court functions in this context as a deferential reviewing court with respect to the [administrator's] decision, and we review the district court's decision de novo, employing the same standards applied by the district court in reviewing the [administrator's] decision." Id. (internal quotations omitted). In Evans, we provided a helpful and in-depth discussion of the abuse of discretion standard in ERISA cases, beginning with the following principle: "At its immovable core, the abuse of discretion standard requires a reviewing court to show enough deference to a primary decision-maker's judgment that the court does not reverse merely because it would have come to a different result in the first instance." Id. at 322. It is also important to keep in mind that "the abuse of discretion standard . . . like other such standards, bites mainly in close cases," and in a close case, a court "should . . . acknowledge[] the essential equipoise and stay[] its hand." Id. at 325.

Particularly as to ERISA, we advised, a court should "not disturb an ERISA administrator's discretionary decision if it is reasonable," and "an administrator's decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Id. at 322

15

(internal quotations omitted). In <u>Donovan v. Eaton Corp. LTD Plan</u>, 462 F.3d 321, 329 (4th Cir. 2006), this court held an administrator's reasoning process to be unprincipled when the administrator ignored pro-beneficiary evidence. As we have noted, "what rightly offended the <u>Donovan</u> court was not [the administrator's] selectivity (which is part of a plan administrator's job), but its 'wholesale disregard' of evidence in the claimant's favor." <u>Evans</u>, 514 F.3d at 326 (quoting <u>Donovan</u>, 462 F.3d at 329).

Applying these principles to the facts of this case, we conclude that Eaton's decision was reasonable. First, the district court was incorrect that Eaton disregarded Dr. Riley's October 2008 letter. The record is clear that Eaton thoughtfully considered the views of Dr. Riley. Eaton and its reviewers discussed Dr. Riley's views, but gave them little weight because of their inconsistency and the fact that many of them were not based on objective evidence. Furthermore, Dr. Riley's conclusions--those of a well-meaning family doctor--were contradicted by several specialists, who gave no indication of unreliability. It was not unreasonable to discount Dr. Riley's conclusions in these circumstances. <u>See</u> <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 834 (2003) ("[C]ourts [may not] impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts

16

with a treating physician's evaluation."); see also id. at 832 (noting that a treating physician's conclusion may be questioned because "a treating physician, in a close case, may favor a finding of 'disabled' ").

Second, the district court was incorrect that Eaton ignored potential side effects of Scott's medication in concluding that she was able to work. Dr. Lumpkins, in reviewing Scott's record for Sedgwick, noted that Scott can do sedentary work but that side effects of Percocet would keep Scott from "working at unprotected heights, driving a company vehicle, [and] working with heavy machinery or safety sensitive materials." J.A. 573. Then, in the final cancellation letter, Eaton stated, "We also note that although Dr. Riley expresses concern with respect to Ms. Scott's ability to perform sedentary work given the medications she uses, his office notes and records do not evidence the cognitive changes that he told the independent physician reviewer may impact her functional capacity." J.A. 92. This is sufficient consideration, especially considering the lack of objective evidence supporting the existence of such side effects. See Evans, 514 F.3d at 326 (noting approvingly that "[t]he benefits cancellation letter . . . gave due regard to the evidence in [the beneficiary's] favor").

Finally, the district court erred in reversing Eaton's decision, which was based upon--at best--conflicting evidence.

17

In favor of a finding of disability were only Scott's subjective complaints, the inconsistent conclusions of Scott's primary physician, and some objective evidence of RA. Against a finding of disability were not only the unanimous assessments by peer reviewers, but also the following facts: (1) Dr. Riley's diagnosis of RA has never been substantiated by a rheumatologist and a bone scan revealed no obvious signs of RA; (2) Dr. Riley's diagnosis of RSD, a neurological condition, was refuted by Scott's treating neurologist, Dr. Sida, who found no neurological cause of her pain; and (3) there is no objective evidence Scott suffers side effects from her medication and Scott had been observed by Dr. Sida as alert and oriented.[9] Based on this evidence, Eaton's decision to end Scott's benefits was not unreasonable. See Elliot v. Sara Lee Corp., 190 F.3d 601, 606 (4th Cir. 1999) (noting that an administrator does not abuse its discretion by denying benefits if the record contains "conflicting medical reports").

---

[9] Scott has not argued that her mental illness entitled her to LTD benefits.

III.

For the foregoing reasons, the holding of the district court is

REVERSED.