## Keith BOWLING

v.

## PBG LONG–TERM DISABILITY PLAN and VPA, Inc.

**Civil No. JFM–07–02984.**

United States District Court, D. Maryland.

Nov. 5, 2008.

Gregory George Paul, Robert Peirce and Associates PC, Pittsburgh, PA, for Keith Bowling.

Brett Anthony Buckwalter, Niles Barton and Wilmer LLP, Baltimore, MD, Richard J. Pautler, Thompson Coburn LLP, St. Louis, MO, for PBG Long–Term Disability Plan and VPA, Inc.

## MEMORANDUM

J. FREDERICK MOTZ, District Judge.

On November 5, 2007, plaintiff Keith Bowling ("Bowling") filed suit under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, challenging the termination of his long-term disability benefits by defendants PBG Long–Term Disability Plan and VPA, Inc. ("VPA"). VPA filed a counterclaim requesting an equitable lien on alleged overpayments made to Bowling. Now pending before the Court is Defendants' Motion for Summary Judgment as to Plaintiff's claim and Defendants' counterclaim. For the reasons that follow, I will grant Defendants' motion.

### I. Factual Background

The facts that follow are presented in the light most favorable to the non-moving party. *See Lee v. York County Sch. Div.*, 484 F.3d 687, 693 (4th Cir.2007). Keith Bowling began his employment with the Pepsi Bottling Group, Inc. ("PBG") on July 29, 2003. (Mem. Supp. Defs.' Mot. Summ. J. ("Defs.' Mem.") 1.) He participated in the PBG Long Term Disability ("LTD") Plan ("the Plan"), an employee welfare benefit plan administered by VPA. Bowling was employed at PBG as a Delivery Driver, where he prepared daily deliveries, drove to delivery locations, and delivered products to customers. (Defs.' Mem., Ex. 2A at 85.) The physical demands of his position included frequent lifting and carrying of up to 100 pounds, frequent bending, standing, walking, and sitting, and occasional squatting, kneeling, twisting, turning, and climbing. (*Id.* at 86.)

On August 26, 2003, less than a month after beginning work at PBG, Bowling became unable to perform his job as a Delivery Driver.[1] (Answer ¶ 7.) He was awarded 26 weeks of short-term disability benefits beginning August 26, 2003, and long-term disability benefits beginning February 24, 2004. (Pl.'s Response Defs.' Mot. Summ. J. ("Pl.'s Response") 2.)

Bowling was first treated by Dr. Mikhail, a family practitioner, who completed Bowling's certificate for disability benefits on October 23, 2003. (Defs.' Mem., Ex. 2A at 245.) Dr. Mikhail diagnosed Bowling with lower back pain and radicilitis. (*Id.* at 246.) Dr. Naiman, an orthopedic surgeon, also treated Bowling in October 2003. After examining Bowling and reviewing radiographs and MRI films, Dr. Naiman diagnosed him with a congenital

---

**1.** The parties do not specify the cause of Bowling's injury. One item in the administrative record indicates that the accident occurred when Bowling slipped on a step of his vehicle while at work on August 25, 2003. (*See* Defs.' Mem., Ex. 2A at 78 (medical evaluation reporting that Bowling stated the "accident occurred when he slipped on a step").) Other items state that Bowling was involved in an automobile accident on August 25, 2003. (*See, e.g., id.* at 277 (medical slip from Dr. Mikhail dated October 17, 2003, stating that "Mr. Bowling is currently under Treatment for his Back Injury aquired [sic] from his MVA in 8/25/03 which may prevent him from participating in physical activity"); *id.* at 249 (report from Dr. Naiman noting that "[t]he patient states that on 8/25/03, he was the restrained driver of a ... motor vehicle ... in a motor vehicle accident").)

anomaly of the lumbar spine, a pars defect, and spondylolisthesis. (*Id.* at 249–50.) Dr. Naiman recommended physical therapy and anti-inflammatories. (*Id.* at 250.) He also "recommended that [Bowling] resume occupational activities on a light duty basis." (*Id.*) According to Dr. Naiman's report, Bowling stated to Dr. Naiman that "he will not resume occupational activities." (*Id.*)

Dr. Mikhail referred Bowling to Dr. Park for a neurological consultation. (*Id.* at 258.) Dr. Park first saw Bowling on November 6, 2003, and observed that Bowling "has a difficult time walking or standing straight" and "cannot walk any length of time." (*Id.*) Dr. Park recommended physical therapy, muscle relaxants, and anti-inflammatories, and noted that Bowling may need a stabilization procedure in his back if his condition did not improve. (*Id.*) Dr. Park continued to see Bowling over the coming months, with Bowling's next visit on December 11, 2003. (*Id.* at 257.) At that point, Bowling had not started physical therapy due to a change in insurance. (*Id.*) Bowling returned to Dr. Park on January 15, 2004, by which time he had completed some physical therapy and was "feeling maybe a little better." (*Id.* at 151.) Dr. Park recommended that the physical therapy continue. (*Id.*)

On February 24, 2004, after Bowling's 26 weeks of short-term disability expired, VPA began paying long-term disability benefits. In May 2004, Dr. Park reported that Bowling's pain was getting worse and proposed surgery. (*Id.* at 174.) In October 2004, Dr. Park again reported that Bowling's "symptoms are getting worse and worse," and noted that Bowling would like to have surgery. (*Id.* at 190.) On November 4, 2004, Dr. Park wrote that because Bowling was scheduled for a lumbar spinal fusion surgery, he would be unable to work for twelve months. (*Id.* at 192.) On December 21, 2004, Dr. Park told VPA that Bowling was to be scheduled for the surgery, and could not resume work until December 2, 2005. (*Id.* at 193.) As of July 3, 2007, Bowling had not undergone any surgical procedures. (*Id.* at 60.)

During the first 24 months of disability benefits, a participant is considered "totally disabled" under the Plan if he is unable "to perform all of the material or essential duties pertaining to his 'own occupation.'" (*Id.* at 11; Plan Documents at 2.25(a)(1).) After 24 months of disability, however, the Plan's definition of "totally disabled" is more stringent. A participant is entitled to benefits only if he is unable to engage in any "Reasonable Occupation ... for which he is, or may reasonably become, qualified by education, training, or experience, and [t]hat is available to the Participant in his geographic area." (*Id.* at 12; Plan Documents at 2.25(a)(3).) On February 1, 2005, a VPA representative informed Bowling that the stricter definition of "Total Disability" would take effect on August 27, 2005. (*Id.* at 194–95.) The letter indicated that VPA was evaluating Bowling's continued eligibility for benefits. (*Id.* at 195.) Toward that end, VPA requested an independent orthopedic evaluation, which was performed by Dr. Halikman on July 11, 2005. (*Id.* at 78.) Bowling reported to Dr. Halikman that his condition since the 2003 accident had not really improved. (*Id.*) After examining numerous medical records and conducting a physical examination of Bowling, Dr. Halikman diagnosed Bowling with "pre-existing degenerative lumbar disc disease with an isthmic spondylolisthesis and foraminal stenosis." (*Id.* at 81.) Dr. Halikman concluded:

> This gentleman is not able to do his regular job at this time. He could do sedentary work, but it should be noted that sitting for extended periods of time may also be bothersome for him. He is not able to lift objects at this point

weighing more than twenty pounds on a regular basis and working in any type of awkward positions such as stooping, bending, squatting, kneeling or crawling would be absolutely forbidden.

(*Id.*) Dr. Halikman's opinion was that Bowling was "not able to work at his usual job at this time and from a practical matter, it would be difficult for him to work in any kind of gainful employment." (*Id.* at 82.) In addition to his report, Dr. Halikman completed a Physical Capacities Evaluation Form, indicating that Bowling could stand for a total of two hours at a time during a regular workday, and walk, sit, or drive for a total of one hour at a time each during a regular workday. (*Id.* at 83.)

VPA also requested an Employment Assessment to determine whether suitable employment existed within Bowling's geographic area. (*Id.* at 114, 117.) VPA provided the vocational rehabilitation counselor with the following work restrictions, taken from Dr. Halikman's report:

Sedentary work without sitting for long periods of time. No lifting objects more than 20 lbs on a regular basis and no working in ackward [sic] positions such as stooping, bending, squatting, kneeling or crawling.

(*Id.* at 114, 118.) The counselor reviewed Bowling's Training, Education & Experience Questionnaire, the Job Description of a Delivery Driver, seven medical reports from Dr. Park, one medical report from Dr. Naiman, an unknown number of reports from Dr. Mikhail, and one report from Dr. Halikman. (*Id.* at 118–19.) The counselor's report noted that Bowling needed to have breaks throughout the day, as he could not sit for extended periods of time, and that he could not stand for six hours a day as some jobs require. (*Id.*) Based on Bowling's medical history, educational background, and vocational history, the counselor concluded that Bowling could perform the jobs of motel clerk, gate

guard, dispatcher, and cashier. (*Id.* at 117–20.) The estimated hourly wages for these four jobs were $7.93, $8.74, $11.82, and $7.17, respectively. (*Id.* at 120.)

To qualify as a reasonable occupation, a job must provide income that is at least 50% of a Participant's Eligible Pay. In VPA's referral of the case to the vocational counselor, it listed Bowling's Eligible Pay as $30,056, 50% of which would amount to $7.23 per hour. (*Id.* at 114, 117.) Three of the four jobs identified by the counselor paid above this amount. (*See id.* at 120.) Based on the finding that a reasonable occupation was available to Bowling in his geographic area, VPA notified Bowling on August 3, 2005 that his disability benefits would terminate on August 27, 2005. (*Id.* at 112.) VPA based its decision on the three employment opportunities available to Bowling above his reasonable earning wage. (*Id.*) VPA explained that Bowling could appeal the decision and submit additional facts and documents to support his claim. (*Id.*) VPA informed Bowling that he could "submit current objective medical [sic] that supports your continued disability," after which he would be "sent out for an Independent Medical Evaluation to substantiate any dispute to your current restrictions and limitations that were determined during your Independent Medical Evaluation on July 11, 2005 that shows you are capable of doing sedentary work." (*Id.*)

Bowling appealed VPA's decision on January 24, 2006. (*Id.* at 234.) He first challenged the calculation of his annual base salary, claiming it should be $56,212, not $30,056. (*Id.* at 235.) Bowling argued that he was paid $14 per hour during training with PBG, but after his release from training status, he began making $27.025 per hour. (*Id.* at 234.) Second, Bowling challenged VPA's determination that even though he could not perform his

prior duties as a delivery driver, he could still perform sedentary work. (*Id.* at 235.) It does not appear that Bowling submitted any additional medical evidence for the appeal. By letter dated April 6, 2006, VPA notified Bowling that it affirmed its decision to terminate his benefits. (*Id.* at 228.) Addressing first Bowling's annual base salary, VPA stated that "PBG, Inc. reports that Mr. Bowling's Eligible Pay for purposes of determining his disability benefit is $30,056.00 annually." (*Id.* at 229.) Next, addressing Bowling's ability to perform sedentary jobs, VPA discussed the difference between the delivery driver position, which required heavy lifting and carrying, and the occupations identified by the vocational counselor, which are classified as sedentary positions. (*Id.*) VPA reaffirmed its decision that Bowling did not meet the definition of "totally disabled" under the Plan. (*Id.* at 230.)

Bowling applied for Social Security disability benefits on July 15, 2004, based on the same condition he presented in his benefits application to VPA. (*Id.* at 171.) His initial claim was denied on October 22, 2004. (*Id.* at 184.) VPA referred Bowling to a law firm for assistance with his social security appeal, *id.* at 186, and the firm filed a Request for Reconsideration on Bowling's behalf on November 19, 2004. (*Id.* at 184.) On February 21, 2005, the Social Security Administration determined that Bowling was entitled to monthly social security benefits beginning April 2004. (*Id.* at 198.) Bowling timely informed VPA of the Social Security payments, as required under the Plan. (*Id.* at 197.) VPA requested full reimbursement of an alleged overpayment under the Plan resulting from Bowling's receipt of Social Security benefits and notified Bowling that it would withhold certain amounts of future benefits until it received repayment. (*Id.* at 76.)

## II. Standard of Review

A motion for summary judgment should be granted when the record establishes that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The substantive law of the cause of action determines which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine and summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In analyzing whether a genuine issue of material fact exists, the evidence and reasonable inferences from that evidence must be viewed in the light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. 2505.

The PBG LTD Plan is governed by ERISA. *See* 29 U.S.C. § 1003. Under Section 502(a)(1)(B) of ERISA, a "civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). In reviewing a plan administrator's decision to deny benefits, a court must determine whether the plan gives the administrator the discretion to construe uncertain terms and determine eligibility for benefits. *Booth v. Wal–Mart Stores, Inc.,* 201 F.3d 335, 340–41 (4th Cir.2000); *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If the plan does not grant discretionary authority, the court reviews the employee's claim *de novo,* looking to the plan's terms and other manifestations of the parties' intent. *Booth,* 201 F.3d at 341. If, on the other hand, the plan confers discretion on the

administrator, the court reviews the administrator's decision for abuse of discretion. *See id.* at 341–42.

In the instant case, the LTD Plan gives its claims administrator discretion to determine benefit amounts and to construe the terms of the Plan.[2] Bowling agrees that the abuse of discretion standard of review applies. (Pl.'s Response 4.) Accordingly, the standard of review here is abuse of discretion.

 Under abuse of discretion review, an administrator's decision will not be disturbed if it is reasonable, even if the court "would have come to a different result in the first instance." *Evans v. Eaton Corp. Long Term Disability Plan,* 514 F.3d 315, 322 (4th Cir.2008); *see also Booth,* 201 F.3d at 341; *Firestone,* 489 U.S. at 111, 109 S.Ct. 948. An administrator's decision is reasonable "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Evans,* 514 F.3d at 322 (*quoting Bernstein v. CapitalCare, Inc.,* 70 F.3d 783, 788 (4th Cir.1995)). Administrators' decisions must "adhere both to the text of ERISA and the plan to which they have contracted; to rest on good evidence and sound reasoning; and to result from a fair and searching process." *Evans,* 514 F.3d at 322–23. The Fourth Circuit has set forth a nonexclusive list of factors a court may consider when determining whether an exercise of discretion is reasonable:

[A] court may consider, but is not limited to, such factors as: (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth,* 201 F.3d at 342–43.

## III. ERISA Benefits Decision

The first issue in this case is whether VPA abused its discretion in terminating Bowling's LTD benefits. Bowling claims that VPA abused its discretion in applying the Plan's provisions to his claim, specifically in its determination of Bowling's ability to perform sedentary work and its calculation of Bowling's eligible pay.

Review of VPA's decision to terminate Bowling's benefits begins with the terms of the Plan. Bowling is eligible for long-term disability benefits only if he meets the criteria for "total disability," a condition defined in the Plan as follows:

A Participant shall be considered to have a Total Disability (or to be Totally Disabled) only so long as all the following tests are met:

(1) *Cannot Perform Own Occupation:* The Participant is unable, due to illness, injury or pregnancy, to perform all of

---

**2.** The PBG Plan provides: "[T]he Claims Administrator shall have the exclusive discretionary authority to determine all questions of eligibility of benefits and to determine the amount of such benefits payable under the Plan. This discretionary authority ... shall also include the right to construe and to interpret the Plan." (Defs.' Mem., Ex. 2A at 41; Plan Documents at 6.9.) The Plan further provides that the "determination of whether a Participant is Totally Disabled, including determination of all relevant factors (*e.g.,* 'geographic area') shall be made by the Claims Administrator, or its delegate at its sole discretion." (*Id.* at 14; Plan Documents at 2.25(c).)

the material or essential duties pertaining to his "own occupation," by which is meant the general duties that are normally required for the performance of the Participant's general type of work activity in which the Participant engaged prior to commencement of his Period of Disability either for the Employer or any other employer and which cannot be reasonably omitted, changed or accommodated.

(2) *Not Engaged in a Reasonable Occupation:* The Participant is not engaged in any Reasonable Occupation.

(3) *Unable to Engage in a Reasonable Occupation:* To the extent the Participant's continuous Period of Disability exceeds 24 months, the Participant is unable to engage in any Reasonable Occupation:

(i) For which he is, or may reasonably become, qualified by education, training, or experience, and

(ii) That is available to the Participant in his geographic area as determined by the Claims Administrator.

(4) *Under Physician's Treatment:* The Participant is under the treatment of a Physician (unless such medical care is not required under Section 4.5(b) on account of religious belief).

(Defs.' Mem., Ex. 2A at 11; Plan Documents at 2.25(a).) Because Bowling's period of disability exceeds 24 months, the definition in subsection three, "Unable to Engage in a Reasonable Occupation," applies. "Reasonable Occupation" is defined by the Plan as:

Any employment or other occupation for pay or profit (other than for Rehabilitation Income) that provides a level of pay that is at least 60 percent of the Participant's Eligible Pay immediately before the first day of the Participant's Total

Disability for a Participant classified by the Employer as a salaried Employee; 50 percent of the Participant's Eligible Pay on such date for a Participant classified by the Employer as an hourly Employee.

(*Id.* at 10; Plan Documents at 2.22.) Because Bowling was an hourly employee, a potential employment position must pay at least 50 percent of Bowling's Eligible Pay to qualify as a reasonable occupation that would render Bowling ineligible for long-term disability benefits.

I will first consider whether VPA abused its discretion in determining that Bowling could perform a sedentary occupation, and then turn to whether VPA abused its discretion in determining Bowling's "Eligible Pay."

## A. VPA's Determination of Plaintiff's Ability to Work

Bowling contends that VPA abused its discretion in determining that Bowling could perform sedentary work. This argument is without merit.

The record contains numerous medical records collected by VPA from Bowling's various health professionals, and the record indicates that VPA's decision resulted from a principled decision-making process. VPA requested records from Dr. Mikhail, Dr. Park, and Dr. Yissing.[3] (Defs.' Mem., Ex. 2A at 145, 148, 172, 178, 188.) VPA also requested an independent medical evaluation, which was performed by Dr. Louis Halikman. (*Id.* at 227.) After Dr. Halikman's July 11, 2005 evaluation, VPA followed up with Dr. Halikman, asking five additional questions regarding Bowling's condition. (*Id.* at 89.)

---

**3.** Bowling lists Dr. Yissing as a treating doctor on his December 20, 2004 Disability Progress Report. (Defs.' Mem, Ex. 2A at 191.)

VPA requested records from Dr. Yissing, but no records are contained in the administrative record.

VPA's decision was not only the result of a principled decision making process, but its decision that Bowling is able to perform a sedentary occupation was supported by substantial evidence. While Dr. Park proffered that Bowling was unable to return to work, *id.* at 189, 192, Drs. Naiman and Halikman came to the opposite conclusion.

Dr. Naiman, in October 2003, provided the earliest assessment of Bowling's ability to work. (*Id.* at 250.) Dr. Naiman recommended that Bowling "resume occupational activities on a light duty basis." (*Id.*) In July 2005, Dr. Halikman found that Bowling "could do sedentary work, but it should be noted that sitting for extended periods of time may be bothersome for him." (*Id.* at 81.) In making his determination, Dr. Halikman reviewed a number of diagnostic imaging studies of Bowling from 2003 and 2005, including an MRI and x-rays of the lumbar spine. (*Id.* at 80.) He also reviewed Bowling's medical records from Dr. Park and Dr. Naiman. (*Id.* at 81.) Dr. Halikman personally examined Bowling's spine and shoulders and assessed Bowling's voluntary lumbar range of motion. (*Id.* at 79–80.) Dr. Halikman "agree[d] completely with the approach which Dr. Park has selected" and with the underlying medical evidence of Bowling's disc disease and spondylolisthesis. (*Id.* at 81.) However, Dr. Halikman did not agree with Dr. Park's conclusion that Bowling was unable to perform sedentary work.

Notably, Bowling does not challenge the qualifications or credentials of Dr. Halikman. As Bowling recognizes, it is not an abuse of discretion for an administrator to adopt the position of one doctor over another. *See Stup v. UNUM Life Ins. Co. of Am.,* 390 F.3d 301, 308 (4th Cir.2004) ("[A]n administrator does not act unreasonably by denying benefits if the record contains 'conflicting medical reports.'") (*quoting Elliott v. Sara Lee Corp.,* 190 F.3d 601, 606 (4th Cir.1999)). The Supreme Court has explicitly rejected a requirement that plan administrators give greater credit to treating physicians than opinions of plan consultants. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003).

Bowling instead argues that VPA's explanation of its decision to credit Dr. Halikman's report as opposed to Dr. Park's report was insufficient. (*See* Pl.'s Response 5 (claiming error in VPA's giving "no reason as to why it adopted Dr. Halikman's report instead of the opinion of Plaintiff's treating physician, Dr. Park" and the administrative record's failure to "indicate any reasoning process as to why the report of Dr. Halikman was adopted, nor why the opinions of Dr. Park were disregarded").) However, as the Supreme Court explicitly stated in the context of ERISA, "courts [may not] impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Nord,* 538 U.S. at 834, 123 S.Ct. 1965. Therefore, it was not an abuse of discretion for VPA to rely on Dr. Halikman's report without explicitly explaining its decision to do so.[4]

4. Indeed, Dr. Park's determination that Bowling was unable to work may have been made in anticipation of a spinal fusion surgery that Bowling never received. (*See* Defs.' Mem., Ex. 2A at 192 (letter from Dr. Park dated November 4, 2004, stating: "This is to inform you that Mr. Bowling is set to undergo lumbar spinal fusion surgery. Such as that, the patient cannot return to work over the next 12 months."); *id.* at 245 (Dr. Park's December 2004 statement that Bowling could perform "no work" and noting that patient's current treatment program was "to be scheduled for lumbar fusion").) As of July 3, 2007, Bowling had not undergone any surgeries. (*Id.* at 60.) There is no indication that Dr. Park would have reached the same conclusion if the surgery had not been scheduled.

Bowling also claims that the vocational counselor, Mr. Meyers, based his decision that Bowling could perform sedentary work solely on Dr. Halikman's indication that Bowling could stand for two hours at a time and sit for one hour at a time. (Pl.'s Response 6.) Bowling argues that Dr. Halikman did not indicate that Bowling could repeat the standing/sitting process for eight hours a day, five days a week, thus the conclusion that Bowling could perform sedentary work was improper. (*Id.*) However, Dr. Halikman explicitly stated that Bowling "could do sedentary work." (Defs.' Mem, Ex. 2A at 81.) Moreover, Mr. Meyers noted in his report that Bowling "cannot sit on a prolonged basis throughout the day." (*Id.* at 119.) There is no evidence that Mr. Meyers failed to properly consider Bowling's physical limitations.

In light of the above, VPA was not unreasonable in concluding that Bowling was able to perform a sedentary occupation.

### B. VPA's Determination of Plaintiff's Eligible Pay

■ Bowling also charges that VPA abused its discretion in determining Plaintiff's "Eligible Pay." Specifically, Bowling argues that VPA's determination of Bowling's Eligible Pay as $30,056 was unreasonable because VPA did not ask PBG for "any documentation, any reasoning on where PBG got the salary number, or any information as to why the confusion had occurred in the first place." (Pl.'s Response 8.)

In Bowling's case, his Eligible Pay determines whether he meets the Plan's definition of "totally disabled." As discussed above, to be classified as "totally disabled"

after an initial 24 month period, a Plan Participant must be incapable of performing a "reasonable occupation." For hourly employees such as Bowling, a reasonable occupation is employment that pays at least 50% of the employee's "Eligible Pay immediately before the first day of the Participant's Total Disability." (Defs.' Mem, Ex. 2A at 10; Plan Documents at 2.22.) The Plan defines "Eligible Pay" as follows:

A Participant's pay (or a comparable term, *e.g.* eligible payout amount for 1999) which shall be the amount used to calculate the benefit level under Section 4.2 of the Plan shall be prorated as applicable and shall be the greatest of:

(a) The Participant's eligible pay annual base salary, regular bonus (if any), annualized overtime/double overtime/shift premiums (if any), annualized commissions (if any), and value pay (if any), in effect for the year the disability occurred.

(b) The participant's year-to-date pensionable earnings (those earnings used for the purpose of calculating a Participant's retirement benefit) for the year the disability occurred; or

(c) The Participant's pensionable earnings for the year prior to the year in which the disability occurred.

(*Id.* at 7; Plan Documents at 2.8.) Here, Bowling's eligible pay is determined under Subsection (a).[5] The only component of Subsection (a)'s definition of eligible pay applicable to Bowling is "annual base salary."

Bowling claims that his annual base salary was $56,212 (based on $27.025 per hour, forty hours per week). (Pl.'s Response 7.) VPA and PBG assert that Bowling's annual base salary was $30,056 (or

---

**5.** Subsection (b) does not apply because Bowling had only been employed for about a month, thus Bowling's year-to-date pensionable earnings are less than his annual base

salary. Subsection (c) does not apply Bowling was not employed by PBG in the year prior to his disability.

$14.45 per hour). (Defs.' Mem. 10.) If VPA's figure is used, a potential job need pay only $7.22 per hour (half of $14.45) to qualify as a "reasonable occupation." (Defs.' Mem., Ex. 2A at 229.) Three of the jobs listed in the vocational study as being within Bowling's physical abilities have an estimated hourly wage of over $7.22 per hour: motel clerk ($7.93), gate guard ($8.74), and dispatcher ($11.82). (*Id.* at 120.) However, if the higher annual base salary cited by Bowling is the proper figure, a potential job must pay $13.51 per hour. The jobs identified in the vocational study pay less than this, and thus would not be reasonable occupations under the Plan. If no reasonable occupations exist, Bowling meets the Plan's definition of "totally disabled" and remains eligible for long-term disability benefits. Therefore, this dispute turns on Bowling's "Eligible Pay immediately before the first day of the [Bowling]'s Total Disability," with Eligible Pay defined as the "annual base salary . . . in effect for the year the disability occurred." (*Id.* at 7; Plan Documents at 2.8(a).)

The administrative record reflects the extreme confusion over Bowling's annual base salary amongst PBG, VPA, and Bowling. The confusion became apparent shortly after Bowling's accident. On October 28, 2003, VPA sent an e-mail to the PBG Payroll Department asking for Bowling's salary information, as VPA's eligibility file showed a salary of "0." (*Id.* at 288.) At VPA's request, Bowling faxed his recent paystubs to VPA; a paystub for the pay period ending August 23, 2003, reflected a payment of $908.97. (*Id.* at 269–71.) This would result in a yearly income of $47,266.44 and monthly salary of $3,938.87.[6] On November 3, 2003, PBG Payroll informed VPA that Bowling's

monthly salary was $3,224.30, which would amount to a yearly income of $38,691.60. (*Id.* at 289.)

As early as December 24, 2003, Bowling began questioning VPA's calculation of his Eligible Pay. (*Id.* at 290.) On January 5, 2004, Bowling informed VPA that his salary was $56,212, and VPA noted that it would verify Bowling's income before approving his benefits. (*Id.* at 291.) In an internal e-mail chain, one PBG employee first calculated a salary of $30,056, then a few days later came up with a figure of $47,266.44. (*Id.* at 157–58.) This $47,266.44 figure also appears on an undated form entitled "PBG LTD Calculation for 2002." (*Id.* at 160.) Another employee noted that PBG had been paying benefits for Bowling on a salary of $38,692. (*Id.* at 158.)

On February 10, 2004, VPA informed Bowling that he was entitled to LTD benefits based on an eligible pay of $47,266.44. (*Id.* at 162.) On August 2, 2004, Bowling again questioned the salary used by VPA and claimed he made $27.025 per hour and worked a 50 to 60 hour work-week. (*Id.* at 292.) When VPA inquired further, PBG in August 2004 confirmed Bowling's salary was $47,266.44. (*Id.* at 293.)

In March 2005, Bowling again disputed the annual base salary used to calculate his benefits, and VPA informed Bowling that "there is nothing [it] can do unless PBG changes it." (*Id.* at 295.) VPA noted in its report that it contacted PBG regarding Bowling's salary on March 2, 2005; PBG responded on April 26, 2005 that Bowling's correct salary was $30,056. (*Id.* at 295–96.) This appears to be the first time the $30,056 figure was communicated to VPA. A PBG employee's e-mail on April 14, 2005, noted that PBG's records reflected a correct salary of $30,056 and that it was

---

**6.** The information on this paystub was likely the source of the erroneous $47,266.44 figure used initially by VPA as Bowling's income.

Neither party contends $47,266.44 was Bowling's correct base salary.

still trying to determine the source of the $47,266.44 figure. (*Id.* at 217–18.) Another PBG employee responded on April 25, 2005, that "VPA was incorrectly given the amount to use to calculate and . . . PBG discovered this error and it must be rectified." (*Id.* at 216.)

On May 12, 2005, a Human Resources Manager at PBG faxed VPA a Wage and Salary Verification form that had been signed by PBG on December 8, 2003. (*Id.* at 219–20.) The form indicates Bowling's salary on the date of his accident as $27.025 per hour. (*Id.* at 220.) The form does not indicate the number of hours per week worked. (*Id.*) An Earnings Statement for Bowling for the period ending August 9, 2003, listed his year-to-date earnings as $1,394.43. (*Id.* at 222.) Neither the Wage and Salary Verification form nor the Earnings Statement indicate Bowling's annual salary. (*Id.* at 220, 222.)

VPA's claim report noted on May 12, 2005, that PBG's corporate office had confirmed Bowling's salary at the time of disability as $30,056. (*Id.* at 297.) VPA wrote to Bowling shortly thereafter that his "salary was originally reported . . . in error" and "the correct salary we have received from the Corporate Office [is] . . . $30,056.00." [7] (*Id.* at 223.) From May 1, 2005, forward, VPA calculated Bowling's LTD benefits based on the new salary figure of $30,056.

On Bowling's internal appeal of the termination of his benefits in early 2006, Bowling again challenged the salary provided by PBG. (*Id.* at 234–35.) He claimed his annual base salary immediately before his date of disability was $56,212: $27.025 per hour with 2080 work hours per year. (*Id.* at 235.) A VPA Claims Manager asked PBG for confirmation of Bowling's salary. (*Id.* at 231, 307.) On March 25, 2006, PBG confirmed that the $30,056 salary was correct. (*Id.*)

Whether VPA abused its discretion in accepting the $30,056 figure is a close question. From late 2003 until April 2005, PBG repeatedly told VPA that Bowling's base salary was $47,266.44. As defendants recognize, "VPA did not request a further explanation" from PBG when PBG provided the new $30,056 figure in April 2005, and "the administrative record does not explain why $30,056 is the correct 'Eligible Pay.' " (Defs.' Mem. 11.) VPA also did not request an explanation of the hourly wage of $27.025 reported by PBG's Human Resources Department. The "administrative record . . . at the time of the benefit determination [must] contain[ ] sufficient evidence to allow the district court adequately to assess the reasonableness of the plan's decision." *Bernstein*, 70 F.3d at 789. VPA's failure to request an explanation leaves a confusing record as to Bowling's true annual base salary, making it more difficult to assess whether VPA's decision resulted from "a deliberate, principled reasoning process" and was "supported by substantial evidence." *Evans*, 514 F.3d at 322 (*quoting Bernstein*, 70 F.3d at 788).[8]

---

7. Because Bowling had been receiving benefits based on the $47,266.44 figure but only entitled, according to VPA, to receive benefits based on a salary of $30,056, an overpayment in benefits to Bowling for the previous months resulted. (Defs.' Mem., Ex. 2A at 223.) In a letter to Bowling, VPA stated it had discussed Bowling's case with the PBG Corporate Office and agreed "not to pursue the overpayment of $10,177.57 on your account due to the salary was originally reported to us in error and you should not be held responsible." (*Id.*)

8. The defendants attempt to rectify this by providing two different explanations supported by affidavits attached to their memoranda. However, when a district court is reviewing a claim under the abuse of discretion standard, a "plan administrator cannot introduce evidence *post hoc* to support its benefit determination." *Bernstein*, 70 F.3d at 789; *see also Elliott*, 190 F.3d at 608–09.

However, the nature of the contested figure—an employee's annual base salary—supports the reasonableness of VPA's reliance on PBG's statement of Bowling's salary. The Plan itself states that "all decisions regarding a Participant's ... Eligible Pay shall be made by the Plan Administrator," PBG. (Defs.' Mem., Ex. 2A at 36; Plan Documents at 6.1. *See also id.* at 41; Plan Documents at 6.9 ["The Plan Administrator (or its delegate) shall have the exclusive discretionary authority to determine ... a Participant's Eligible Pay."].) The Plan defines "Plan Administrator" as "The Company." (*Id.* at 9; Plan Documents at 2.20.) "The Company," in turn, is defined as "The Pepsi Bottling Group, Inc." (*Id.* at 6; Plan Documents at 2.6.) "Claims Administrator" is defined as the "party or parties that the Company designates to administer claims for LTD Benefits." (*Id.* at 6; Plan Documents at 2.4.) This arrangement is understandable; unlike, for example, determinations regarding payment of benefits, an employee's base salary is uniquely within the purview of the employer. Additionally, the Plan provides that "[e]ach Fiduciary may rely upon any ... information ... of another Fiduciary as being proper under the Plan or the Trust, and is not required under the Plan or the Trust to inquire into the propriety of any ... information." (*Id.* at 36; Plan Documents at 6. 1.) As the Plan dictates that the employer, not VPA, determines Eligible Pay, and the Plan does not require a fiduciary to inquire into information provided by the employer, it was not unreasonable for VPA to rely on PBG's

assertion that Bowling's correct annual base salary was $30,056.

Moreover, as discussed above, VPA repeatedly asked PBG to confirm Bowling's salary. When Bowling on his administrative appeal again challenged the base salary used, VPA requested that PBG confirm the $30,056 salary. They did. It is unclear what more VPA could have done at that point; even if it had requested information regarding the source of the $30,056 figure, the Plan provides that it is PBG, not VPA, that determines an employee's Eligible Pay.

While the administrative record is certainly not a model of clarity, and VPA could have investigated the salary issue more thoroughly, it was not an abuse of discretion for VPA to use the $30,056 figure as Bowling's annual base salary. Because I conclude that VPA's decision to terminate Bowling's benefits was not an abuse of discretion, Defendants' summary judgment motion is granted.

## IV. Defendant's Counterclaim

VPA also moves for summary judgment on its counterclaim for a lien over overpayments made to Bowling as a result of Bowling's receipt of Social Security disability benefits. (Defs.' Mem. 13; *id.* Ex. 2A at 206.) Bowling does not identify any disputed issues of fact, and he does not contest VPA's calculation of the overpayment. The only question here is whether the relief requested by the defendants is "equitable" under Section 502(a)(3)(B) of ERISA. (Pl.'s Response 10–11.) Bowling argues that Defendants' counterclaim is

---

VPA's "decision must stand or fall based on the evidence that was before it at the time." *Donnell v. Metro. Life Ins. Co.,* 165 Fed.Appx. 288, 296 n. 8 (4th Cir.2006) (unpublished). Thus, I must limit my assessment of VPA's termination of benefits to a review of the facts known to VPA at the time it made its decision. Accordingly, I will not consider the two *post*

*hoc* explanations provided by the defendants or the affidavits attached in support of them. However, I note that it is unfortunate this information was not presented to VPA at the time of its decision-making, as the explanations are enlightening as to the source of the confusion regarding Bowling's eligible pay.

not authorized by Section 502(a)(3)(B) because it seeks to impose "personal liability for benefits conferred by one party on another party," which is an action at law, not an action in equity. (Pl.'s Response 10) (*citing Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002).)

Under the Plan, a participant's monthly benefits "shall be reduced" by the amount of "Other Income Benefits," Defs.' Mem., Ex. 2A at 18; Plan Documents at 4.3, including "primary and family Social Security benefits for disability or retirement." (*Id.* at 19; Plan Documents at 4.3(b)(2).) When Bowling was approved for LTD benefits in February 2004, he was told to notify VPA immediately if he received income from other sources, such as Social Security. (*Id.* at 162.) VPA reminded Bowling that he would be expected to reimburse the Plan for any overpayments resulting from such income. (*Id.*) Bowling applied for Social Security benefits, and was notified in February 2005 that he was entitled to monthly disability benefits beginning in April 2004. (*Id.* at 198.) Bowling received a lump sum payment of $11,592 in back benefits for the period covering April 2004 to January 2005.[9] (*Id.* at 199.) In February 2005, Bowling began receiving monthly benefits of $1,184. (*Id.* at 198.)

As a result of overlapping payments from VPA and Social Security, VPA contends that the benefits it paid to Bowling during those months exceeded the amount to which he was entitled. VPA determined that between April 2004 and March 15, 2005, Bowling received an overpayment in the amount of $9,488.89, Defs.' Answer and Counterclaim 11; Defs.' Mem. 13, and in a letter dated March 18, 2005, VPA requested full reimbursement of the overpayment from Bowling. (*Id.* Ex. 2A at 206.) VPA informed Bowling that if full reimbursement was not received within 20 days, it would withhold future benefits and make further attempts to collect. (*Id.*)

VPA wrote again to Bowling on August 16, 2005, asking for full reimbursement of the overpayment and informing Bowling that it would forward the request to a collection agency and withhold future benefits payable towards overpayment. (*Id.* at 236.) Efforts of a collection agency retained by VPA were unsuccessful. (*Id.* at 67, 238–39.) VPA filed this counterclaim requesting a lien on its overpayment of $9,488.89. (Defs.' Answer and Counterclaim 11.)

Regarding overpayments, the Plan provides:

> The Claims Administrator shall take such steps as it deems necessary to obtain prompt repayment of any overpayments under the Plan including requiring immediate repayment where it deems appropriate. Toward this end, the Claims Administrator shall require that an agreement by the Participant to repay overpayments shall be included as part of an application for benefits whenever, in its discretion, this might contribute to safeguarding the Plan. Such agreement may provide for direct repayment by the Participant, assignment of rights to receive income or payments, and transfers of liquid assets. The failure of the Claims Administrator to obtain an agreement, however, shall not limit the Claims Administrator's right to recover an overpayment out of the income or resources of a Participant. In addition, current LTD Benefits may be reduced (in whole or in part) at any time to recover any overpayment.

---

9. This figure was based on an amount of $1,153.40 monthly from April to November 2004, and $1,184.50 for the months of December 2004 and January 2005. (Defs.' Mem., Ex. 2A at 199.)

(Defs.' Mem., Ex. 2A at 31–32; Plan Documents at 4.6.) When Bowling applied for disability benefits, he also signed a "Right of Reimbursement" form, which states in relevant part:

> In return for payment of these benefits, if the payments for the same illness or injury are received, I acknowledge I am obligated to reimburse the plan, as stated in the plan, up to 100%, or to the full extent of any net recovery.... If I receive a plan benefit greater than I should have been paid, I understand that my employer or the plan's Claim Processor has the right to collect overpayment as specified in the plan, including but not limited to, the right to reduce future benefit payments. Lastly, I acknowledge that this agreement is intended to confirm and clarify my obligations, and I understand that I am required under the terms of the plans to reimburse the plans in accordance with this agreement.

(*Id.* at 251.)

Under Section 502(a)(3) of ERISA, a fiduciary may bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). The issue here, then, is whether VPA's efforts to enforce the reimbursement provisions of the Plan constitute a request for "other appropriate equitable relief."

The Supreme Court first considered the scope of the "other appropriate equitable relief" provision in *Mertens v. Hewitt Associates*, where it found that the provision authorized only "those categories of relief that were *typically* available in equity." 508 U.S. 248, 256, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). The Court rejected a claim under 502(a)(3)(B) that sought "noth-ing other than compensatory *damages,*" which it characterized as "the classic form of *legal* relief." *Id.* at 255, 113 S.Ct. 2063 (emphasis in original).

The Supreme Court again considered "other appropriate equitable relief" under 502(a)(3)(B) in *Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), and *Sereboff v. Mid Atlantic Medical Services, Inc.,* 547 U.S. 356, 126 S.Ct. 1869, 164 L.Ed.2d 612 (2006). *Knudson* and *Sereboff* share similar facts. In both cases, participants in insurance plans suffered injuries in car accidents. The insurers paid the participants' medical bills, then filed suit under Section 502(a)(3)(B) for reimbursement from the money obtained by the insured from third-party tortfeasors. Like the instant case, the issue in both cases was whether the relief requested was equitable under Section 502(a)(3)(B). The Court held that *Knudson*'s claim for restitution was not equitable in nature, but it reached the opposite conclusion in *Sereboff.*

In *Knudson,* the funds received from the insured's settlement with a third-party tortfeasor were placed in a Special Needs Trust. 534 U.S. at 214, 122 S.Ct. 708. The insured did not have possession of the funds. *Id.* The Supreme Court first noted that not all restitution is equitable in nature. *Id.* at 212, 122 S.Ct. 708 (finding that "not all relief falling under the rubric of restitution is available in equity"). To determine whether the restitution sought by the insurer in *Knudson* was equitable or legal, the Court "examined cases and secondary legal materials to determine if the relief would have been equitable '[i]n the days of the divided bench.'" *Sereboff,* 547 U.S. at 362, 126 S.Ct. 1869 (*quoting Knudson,* 534 U.S. at 212, 122 S.Ct. 708) (alteration in original). The Court found that a plaintiff seeks equitable restitution

when the money identified as belonging to the plaintiff can "clearly be traced to particular funds or property in the defendant's possession." *Knudson*, 534 U.S. at 213, 122 S.Ct. 708. But when plaintiffs seek " 'a judgment imposing a merely personal liability upon the defendant to pay a sum of money,' " the claims are "viewed essentially as actions at law for breach of contract." *Id.* (*quoting* Restatement of Restitution § 160 cmt. a, pp. 641–42 (1936)) (internal quotation marks omitted). "[F]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* at 214, 122 S.Ct. 708. Accordingly, the suit in *Knudson* was a claim for legal relief that could not proceed under Section 502(a)(3).

In contrast, the insured parties in *Sereboff* set aside a portion of the settlement received from the third-party tortfeasor in an investment account under their control. 547 U.S. at 362–63, 126 S.Ct. 1869. Therefore, according to the Court, the *Sereboff* insurer was seeking "specifically identifiable funds that were within the possession and control" of the insured: funds from the third-party tortfeasor preserved in an investment account. *Id.* (internal quotation marks omitted). The Court found that the "impediment to characterizing the relief in *Knudson* as equitable"—namely, that the insurer did not seek recovery from specified funds or property in the defendant's possession—was not present in *Sereboff. Id.* at 362, 126 S.Ct. 1869. As the insurer sought to "recover a particular fund from the Defendant," the nature of the recovery was equitable. *Id.* at 363, 126 S.Ct. 1869. The Court noted that were the insurer to seek recovery through an equitable lien from the insured's "assets generally," it would be a contract action at law. *Id.*

The *Sereboff* Court found that not only must the nature of the recovery be equitable, but the insurer must also establish that the basis for its claim is equitable. *Id.* at 363, 126 S.Ct. 1869. Under the insurance plan in *Sereboff,* if an insured received other benefits, such as tort settlements, the insured must reimburse the insurer from "[a]ll recoveries from a third party (whether by lawsuit, settlement, or otherwise)." *Id.* at 364, 126 S.Ct. 1869 (alteration in original) (internal quotation marks omitted). This language, the Court stated, "specifically identified a particular fund, distinct from the Sereboffs' general assets," from which the insurer would recover. *Id.* The Plan also identified "a particular share of that fund" to which the insured was entitled: "that portion of the total recovery which is due [the insurer] for benefits paid." *Id.* (internal quotation marks omitted). Because the plan's language created " 'a contract to convey a specific object even before it is acquired,' " an equitable lien was created. *Id.* at 363–64, 126 S.Ct. 1869 (*quoting Barnes v. Alexander,* 232 U.S. 117, 121, 34 S.Ct. 276, 58 L.Ed. 530 (1914)). The plan's language allowed the plaintiff to "rely on a familiar rule of equity" and "follow a portion of the recovery into the Sereboffs' hands as soon as the settlement fund was identified, and impose on that portion a constructive trust or equitable lien." *Id.* at 364, 126 S.Ct. 1869 (*quoting Barnes,* 232 U.S. at 121, 123, 34 S.Ct. 276) (internal quotation marks and brackets omitted).

■ In this case, I must decide whether recovery of overpayments resulting from Social Security payments to a beneficiary is a legal claim, as in *Knudson,* or an equitable claim, as in *Sereboff.* Counter-defendant Bowling, relying entirely on *Knudson,* does not mention *Sereboff* in his opposition. (Pl.'s Response 10–11.)

■ It seems clear to me that the nature of the recovery in this case must be classified as equitable under *Sereboff.* In *Knudson,* the nature of the recovery was legal because the funds to which the plaintiff claimed an entitlement were not in the defendant's possession, but held in a trust. *Knudson,* 534 U.S. at 207, 122 S.Ct. 708. As stated in *Knudson,* a claim for equitable restitution must seek not "to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* at 214, 122 S.Ct. 708. In the instant case, as in *Sereboff,* the funds are in Bowling's possession, and Counterplaintiffs seek recovery of a "specifically identified fund"—the overpayments made to Bowling. *Sereboff,* 547 U.S. at 363, 126 S.Ct. 1869.

The basis for the counter-plaintiff's claim is also equitable. The *Sereboff* Court made clear that, to be considered equitable, a claim must be based on a provision that "specifically identifie[s] a particular fund, distinct from the [defendant's] general assets" and also identifies "a particular share of that fund to which [plaintiff] is entitled." *Id.* at 364, 126 S.Ct. 1869. The Sixth, Seventh, and Eighth Circuits have found that overpayments to beneficiaries resulting from a participant's receipt of social security benefits constitute a particular share of a specific fund to which the plaintiff is entitled. *See Gutta v. Standard Select Ins. Plans,* 530 F.3d 614, 621 (7th Cir.2008); *Gilchrest v. Unum Life Ins. Co. of Am.,* 255 Fed.Appx. 38, 45 (6th Cir.2007) (unpublished); *Dillard's Inc. v. Liberty Life Assurance Co. of Boston,* 456 F.3d 894, 901 (8th Cir.2006).[10] Other district courts have also found, under the reasoning in *Sereboff,* that Section 502(a)(3) permits a claim for recovery of overpayments made by a plan to a beneficiary. *See, e.g., Cusson v. Liberty Life Assurance Co. of Boston,* No. 05–12455–GAO, 2008 WL 4457862, at *23 (D.Mass. Sept.30, 2008); *Helmuth v. Hartford Life & Accident Ins. Co.,* No. 5:08–CV–983, 2008 WL 3200631, at *3 (N.D.Ohio Aug.6, 2008); *Williams v. Group Long Term Disability Ins.,* No. 07–C–6022, 2008 WL 2788615, at *1 (N.D.Ill. July 17, 2008); *Aitkins v. Park Place Entertainment Corp.,* No. 08–CV–4814, 2008 WL 820040, at *24 (E.D.N.Y. Mar.25, 2008); *Fedderwitz v. Metro. Life Ins. Co. Inc.'s Disability Unit,* No. 05–CV–10193, 2007 WL 2846365, at *11 (S.D.N.Y. Sept. 27, 2007); *Schultz v. Progressive Health, Life, and Disability Benefits Plan,* 481 F.Supp.2d 594, 595–96 (S.D.Miss.2007).

Here, the Right of Reimbursement contract signed by Bowling states that a beneficiary is "obligated to reimburse the plan . . . to the full extent of any net recovery," and provides that the employer "has the right to collect overpayment" if a beneficiary "receive[s] a plan benefit greater than [he] should have been paid." (Defs.' Mem., Ex. 2A at 251.) "That agreement creates an equitable lien by agreement on the excess funds paid to plaintiff by defendant in advance of plaintiff's receipt of funds from other sources." *Fregeau v.*

---

**10.** The Fourth Circuit has not yet addressed *Sereboff* in the context of recovery of overpayments to beneficiaries. Its only occasion to consider *Sereboff* was in a case where the plaintiff, a retirement plan participant, sought to recover the amount he would have received had the plan administrators invested his money as instructed. *LaRue v. De Wolff, Boberg & Assoc., Inc.,* 450 F.3d 570, 576 (2006), *overruled by* —— U.S. ——, 128 S.Ct. 1020, 169 L.Ed.2d 847 (2008). The plaintiff did not allege that the funds were in the defendant's possession, but instead alleged that the funds never materialized at all due to the administrator's failure to properly invest the plaintiff's contributions to his 401(k). *Id.* The plaintiff measured his recovery by the value of his loss, a traditionally legal measure, and was precluded from proceeding under an equitable restitution theory. *Id.*

*Life Ins. Co. of N. Am.*, 490 F.Supp.2d 928, 932 (N.D.Ill.2007). The Plan's terms identify a "specifically identifiable fund" upon which an equitable lien will be imposed, and VPA identifies a share of those funds to which it is equitably entitled—the difference between the payments actually made by VPA and the amount Bowling was entitled to receive after accounting for his social security benefits. Counter-plaintiffs do not seek recovery from Bowling's assets generally, or simply assert that they are "contractually entitled to *some* funds for benefits that they conferred." *Knudson*, 534 U.S. at 214, 122 S.Ct. 708. Instead, the basis for their claim is that Bowling "hold[s] particular funds that, in good conscience, belong to [the counter-plaintiffs]." *Id.*

As VPA's complaint constitutes a request for equitable relief, this Court properly has jurisdiction over VPA's counterclaim. VPA's motion for summary judgment as to VPA's counterclaim is granted, and I accept VPA's calculation of the overpayment amount of $9,488.89.

For the foregoing reasons, I grant Defendants' motion for summary judgment as to Plaintiff's claim and as to Defendants' counterclaim.[11] A separate order to that effect is being entered herewith.

### ORDER

For the reasons stated in the accompanying Memorandum, it is, this 5th day of November 2008

### ORDERED

1. Defendants' motion for summary judgment is granted, both as to plaintiff's claim and defendants' counterclaim;

2. Judgment is entered in favor of defendants against plaintiff as to plaintiff's claim; and

3. Judgment is entered in favor of defendants against plaintiff in the amount of $9,488.89 as to defendants' counterclaim.

---

11. Under ERISA, a "court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). VPA requests that I allow Defendants fourteen days within which to submit a claim for attorneys' fees. (Defs.' Mem. 14.) As I will exercise my discretionary authority to deny a claim for attorneys' fees, this request is moot.