# United States Court of Appeals
## For the First Circuit

Nos. 10-1423; 10-1494

D&H THERAPY ASSOCIATES, LLC; ROBIN DOLAN,

Plaintiffs, Appellees/Cross-Appellants,

v.

BOSTON MUTUAL LIFE INSURANCE COMPANY,

Defendant, Appellant/Cross-Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Stahl, Circuit Judges.

Brooks R. Magratten, with whom Michael J. Daly and Pierce Atwood LLP were on brief, for appellant/cross-appellee.
Charles S. Beal, with whom Jonathan E. Pincince and Beal Law, LLC were on brief, for appellees/cross-appellants.

April 20, 2011

**LYNCH**, **Chief Judge**.  Both parties appeal from grants of summary judgment in this dispute concerning the benefit eligibility language of a long-term disability benefit plan regulated by the Employee Retirement Income Security Act (ERISA).  Plaintiffs D&H Therapy Associates, LLC (D&H), and Robin Dolan appeal from a grant of summary judgment against their claims that Dolan was eligible for and entitled to benefits under the plan or, in the alternative, damages for fraud in the inducement.  Defendant Boston Mutual Life Insurance Company (Boston Mutual), in turn, appeals from entry of summary judgment against its counterclaim that it is entitled to reimbursement for payments already made to Dolan, which it says were mistaken.

D&H obtained an ERISA plan from Boston Mutual in 2000. Under the plan, employees who suffer specified reductions in monthly earnings due to long-term disability are eligible for benefits.  Dolan is both a part-owner and an employee of D&H.  In 2001, she became physically unable to continue some of her tasks as an employee, which prompted a reduction in her monthly W-2 earnings.  In 2002, she began receiving benefits under the plan. After a 2006 audit, however, Boston Mutual terminated the benefits and demanded Dolan return past payments.  It told Dolan that she had failed to account for her non-salary income, including earnings from her ownership stake in D&H.  With those ownership earnings included, Boston Mutual stated, Dolan's monthly earnings had been

higher than her pre-disability monthly earnings since 2002, and so she was not and had never been eligible for payments.

After Dolan filed unsuccessful administrative appeals with Boston Mutual's third-party claims administrator, she and D&H initiated this litigation against Boston Mutual. Except as needed we refer to both plaintiffs as Dolan. Dolan challenges her benefit termination on two grounds. First, she argues that the plan defines "earnings" as W-2 income such that non-salary income is not relevant to eligibility determinations. Second, she argues that Boston Mutual should be estopped from construing the plan otherwise because it represented to D&H at the time of purchase that the plan defined "earnings" as W-2 income. In the alternative, Dolan claims that Boston Mutual's representations fraudulently induced D&H to forego renewing its preexisting insurance policy. Boston Mutual counterclaims that under the plan it is entitled to reimbursement of the $163,661.57 it paid to Dolan.

The district court granted summary judgment to each party on the claims brought by the other. As to Dolan's claims, it held that Boston Mutual's construction of the plan's language was within its discretion as the plan administrator and that Dolan's fraudulent inducement claim was preempted by ERISA. As to Boston Mutual's counterclaim, it held that the reimbursement sought did not qualify as appropriate equitable relief under ERISA.

We hold that Boston Mutual abused its discretion when it determined that Dolan has never been eligible for benefits under the plan. This holding requires entry of judgment for Dolan on both her wrongful denial of benefits claim and on Boston Mutual's counterclaim for recoupment of past payments. Accordingly, we reverse the district court's entry of judgment for Boston Mutual on Dolan's denial of benefits claim and affirm for Dolan on Boston Mutual's counterclaim. We need not reach Dolan's equitable estoppel argument or her fraud in the inducement claim.

I.

Dolan and her partner Kim Havunen each hold a half ownership stake in D&H, a firm that provides physical, occupational, and speech therapy services at several clinics in Rhode Island.[1] At all times relevant to this suit, Dolan and Havunen were also employees of the firm. Dolan served as the director of clinical services and as a physical therapist, while Havunen served as the director of business operations. Like other employees of the firm, Dolan and Havunen drew salary based on the number of hours they worked. Their salaries were not influenced, at least directly, by their ownership stakes in D&H.

---

[1] D&H has been a limited liability company since 2004, when it transferred its status from a partnership. A predecessor entity, Professional Rehabilitation Network (PRN), purchased the two long-term disability insurance policies described in this dispute. For ease of exposition, we refer to the present limited liability company and its predecessor entities collectively as D&H.

A.          D&H's Acquisition of the Boston Mutual Plan

In 1997, D&H obtained a long-term disability insurance policy from Guarantee Life Insurance Company (Guarantee Life). D&H obtained the policy with the help of an insurance agent, Benefit Services, Inc. (Benefit Services). Havunen led the efforts to obtain this policy. She testified that she explained to a Benefit Services representative that D&H wanted a policy that would protect W-2 earnings such that the principals of the firm would be insulated against loss of the salary form of their income. Havunen understood the Guarantee Life policy to reflect this request. According to Havunen, the policy defined protected earnings for principals as W-2 earnings.

In 2000, the Guarantee Life policy was expiring. As D&H considered whether to renew the policy, the same Benefit Services representative who had assisted D&H with the Guarantee Life policy contacted Havunen. The representative, Maureen Baker, informed Havunen that she had received a quote from a different insurance provider at a better rate. Havunen testified that she told Baker that D&H would only consider switching to the new policy if the policy protected W-2 earnings in the same manner as she understood the Guarantee Life policy did. Havunen testified further that when Baker identified the quote in question as belonging to Boston Mutual, Havunen reiterated this requirement.

To ensure that the Boston Mutual policy would meet these specifications, Havunen testified, she and Baker met with a Boston Mutual agent, Thomas Liszanckie. Havunen testified that Liszanckie assured her that the Boston Mutual policy would contain the same definitions of "earnings" and "income" as the Guarantee Life policy. She testified as well that Liszanckie brought a written "Group Insurance Proposal," which he said contained the requested protection for W-2 income. Havunen testified that Liszanckie identified the last page of the proposal as ensuring this protection. That page includes the following statement: "Definition of Earnings: Basic Annual Earnings shall mean the Insured Person's earnings for the prior calendar year as reported by the Group Policyholder on form W-2."

Havunen testified that, based on Liszanckie's statements and the proposal's definition of earnings, D&H did not renew the Guarantee Life policy and instead purchased the Boston Mutual policy. When Havunen received the final language of the policy, she expressed some concern to Baker about the policy's terms relating to "any other income from employment," which might be construed to include income other than W-2 income. Baker, Havunen testified, assured her that this language only referred to other income that may be included in W-2 earnings, like bonuses and commissions. Havunen did not contest the final policy language.

-6-

She testified that D&H would not have signed on to the policy if not for Liszanckie and Baker's representations.

Boston Mutual disputes Havunen's testimony concerning her conversations with Baker, the content of the Guarantee Life policy, and her interactions with Liszanckie. Baker testified that, in her discussions with Havunen about both the Guarantee Life policy and the Boston Mutual policy, Havunen told her that she wanted to protect the K-1 income of D&H's principals, not their W-2 income. Baker also speculated that a portion of the Guarantee Life policy not present in the record defined earnings for principals differently from that of other employees and included non-salary income.[2] Liszanckie testified that while he occasionally dropped off insurance forms to customers before they signed an insurance policy, he rarely met with the customers and he could not recall whether he met with Havunen and Baker.

B.        The Terms of the Boston Mutual Plan

Having reviewed these disputed facts concerning D&H's decision to obtain the Boston Mutual policy, we turn to the plan language that governs that policy. There is no dispute that the policy, unlike the Guarantee Life policy, is governed by ERISA. We

---

[2]    Baker testified that the policy laid out different benefit schedules for principals and all other employees. She acknowledged that a portion of the policy defined earnings as W-2 earnings, but speculated that this portion only applied to non-principal employees and that a portion of the policy not present in the record gave a separate definition of earnings that applied to principals.

divide discussion of the plan's contents between provisions concerning benefit eligibility, provisions concerning benefit calculation, and provisions concerning overpayment of claims.

As to benefit eligibility, principals and all other employees are eligible for benefits if they suffer a specified loss in earnings due to disability. This applies when these individuals "are not able to perform some or all of the material and substantial duties of [their] regular occupation" and "have at least a 20% loss in [their] pre-disability earnings." This litigation does not concern what rises to an inability to perform occupational duties.

It concerns, instead, what it means to have a 20% loss in pre-disability earnings as defined by the plan. For both principals and all other employees, the plan gives these definitions concerning earnings: "Pre-disability earnings means your monthly rate of earnings from the employer in effect just prior to the date disability begins. Basic annual Earnings shall mean the Insured Person's earnings for the prior calendar year as reported by the Group Policyholder on form W-2, excluding commissions." If an individual has earnings for less than a calendar year, the plan provides that "Basic Annual Earnings shall be determined by averaging the monthly earnings for each month worked and annualizing the result."

The plan lists a series of circumstances that justify benefit termination. These include when an individual is "no longer disabled," has "reached the end of the maximum payment duration," or has "current earnings [that] exceed 80% of [his or her] pre-disability earnings." Benefits will also be terminated when an individual is "able to increase [his or her] current earnings by increasing the number of hours [he or she] work[s] or the number of duties [he or she] perform[s] in [his or her] regular occupation but . . . do[es] not do so." The plan emphasizes, in bolded all-capital letters, that if an individual is "disabled and working, earning more than 80% of [his or her] pre-disability earnings, no payment will be made."

As to benefit calculation, the plan specifies that the maximum monthly payment is $6,000 and the minimum monthly payment is $100 or 10%, presumably of monthly pre-disability earnings. It includes two formulas for benefit calculation. The first applies to individuals "earning less than 20% of [their] pre-disability earnings," whether they are currently working or not. The second applies to individuals working and "earning between 20% and 80% of [their] pre-disability earnings." The plan makes no express provision for how to calculate benefit payments for individuals who are not working but are nonetheless earning between 20% and 80% of their pre-disability earnings.

The specifics of the two formulas are as follows. Under the first, monthly payments are figured by taking the lesser of (a) $6,000 and (b) 60% of "pre-disability earnings," and then subtracting "any other income amounts except any income [the individual] earn[s] or receive[s] from any form of employment." Under the second, benefits are initially the lesser of (a) $6,000, (b) 100% of "pre-disability earnings" minus "any other income amounts including current income [the individual] earn[s] or receive[s] from any form of employment," and (c) 60% of "pre-disability earnings." After 24 months, additional payments under this formula are determined by taking the lesser of (a) $6,000, and (b) 60% of "pre-disability income," and then subtracting 50% of "any income [the individual] earn[s] or receive[s] from any form of employment" and 100% of "any other income amounts."

The policy defines "other income amounts" in six categories. All the categories except for one pertain to benefits and awards an individual either receives or is eligible to receive under specified laws or employer insurance plans. The remaining category, particularly important for our purposes, states that "other income amounts" includes "any income you earn or receive from any form of employment."

As to overpayment, the plan provides, "We have the right to recover overpayments due to fraud; an error we make in processing your claim; [or] your receipt of other income amounts."

-10-

It also states, "If we determine that we overpaid your claim, then we require you repay us in full. We will determine the method by which you will repay us."

C.    The Dispute Under the Boston Mutual Plan

In February 2001, shortly after D&H obtained the Boston Mutual policy, Dolan underwent orthopedic surgery. When she returned to work in August 2001, she worked fewer hours and received less salary. In January 2002, Boston Mutual approved Dolan's claim under the policy and began dispensing benefits. These benefits continued until 2006, when Boston Mutual's third-party claims administrator, Disability Reinsurance Management Services (DRMS), conducted an audit.

Based on the audit, DRMS concluded that Dolan's benefit payments had not properly taken account of business profits she received as a principal of D&H and another entity, Associated Professional Management, Inc. With those profits included, DRMS calculated Dolan's pre-disability monthly earnings to be $5,833.33 and her post-disability monthly earnings in 2002 to be $7,670.67. In an August 2006 letter, Boston Mutual informed Dolan of the audit and asserted its right under the policy to recover overpayments due to "fraud or error." Dolan, through her attorney, contested this finding. She argued that this business income fell outside the definition of "earnings" relevant for determining eligibility under the policy.

-11-

Notwithstanding Dolan's objections, by an October 2006 letter Boston Mutual discontinued her benefits and reasserted its demand that she repay past benefits. The letter stated that the benefits Dolan had received since January 2002 had resulted in an overpayment of $145,958.32. Dolan twice appealed the termination determination, and in each case DRMS denied the appeal. In her appeals, Dolan argued that she had disclosed her ownership interests at all relevant times and that the intention of D&H and its principals in purchasing the policy had been to protect W-2 earnings. She did not submit evidence that Boston Mutual had represented to D&H that the policy would protect W-2 earnings in this fashion. After DRMS denied these appeals, Dolan filed this lawsuit.

In the district court, Dolan challenged her benefit termination under ERISA's civil enforcement provision, 29 U.S.C. § 1132. She argued that (1) the plain language of the plan renders non-salary income irrelevant for benefit eligibility, and (2) Boston Mutual should be equitably estopped from asserting otherwise given Liszanckie's representations to Havunen. In the alternative, Dolan argued that D&H was fraudulently induced to purchase the Boston Mutual plan and sought damages in tort under state law. As a remedy for fraudulent inducement, Dolan argued that she was entitled to the benefits she would have received under the Guarantee Life policy had D&H renewed it. Dolan also asserted

state law contract claims, but later conceded that these claims are preempted by ERISA.

Boston Mutual counterclaimed, demanding reimbursement under the plan for $163,661.57 in overpaid benefits.[3] The parties cross-moved for summary judgment on Dolan's claims and Boston Mutual's counterclaim.

Three arguments Boston Mutual made before the district court are relevant on appeal. First, it argued that its determination that Dolan had not been eligible for benefits was reasonable and within the discretion afforded to certain plan administrators under ERISA. Second, it argued that the district court could not consider four affidavits Dolan submitted concerning purported misrepresentations because they had not been part of the administrative record.[4] Third, it argued that ERISA preempts Dolan's state claim for fraud in the inducement.

Initially, the district court granted Boston Mutual's motion for summary judgment on Dolan's claims but denied both parties' motions for summary judgment on Boston Mutual's counterclaim. Boston Mutual moved for reconsideration of the

---

[3] The counterclaim originally sought $145,958.32 in overpaid benefits. Boston Mutual subsequently recalculated the amount of the overpayment.

[4] These affidavits include Havunen's testimony concerning the circumstances surrounding D&H's decision to purchase the Boston Mutual policy, as well as some of Liszanckie's testimony. They also include Dolan's testimony concerning her disabling condition and interactions with Boston Mutual.

-13-

denial of summary judgment as to its counterclaim in light of a Supreme Court decision, Sereboff v. Mid Atlantic Medical Services, Inc., 547 U.S. 356 (2006), on permissible relief under ERISA that the district court had not considered. Dolan moved for reconsideration of her claims in light of a recent decision of this court, Denmark v. Liberty Life Assurance Co. of Boston, 566 F.3d 1 (1st Cir. 2009), concerning conflicts of interest in certain discretionary decisions by ERISA plan administrators.

The district court reaffirmed its grant of summary judgment for Boston Mutual on Dolan's claims. On reconsideration, however, it granted Dolan's motion for summary judgment on Boston Mutual's counterclaim. In the two decisions, the district court held (1) Boston Mutual's eligibility determination was reasonable and thus entitled to deference under ERISA, (2) ERISA preempts Dolan's claim for fraud in the inducement under 29 U.S.C. § 1144(a), and (3) Boston Mutual's claim for reimbursement for overpaid benefits is not "appropriate equitable relief" under 29 U.S.C. § 1132(a)(3). The district court did not expressly address Dolan's equitable estoppel argument. It also did not address Boston Mutual's motion to strike the four contested affidavits, as the motion was deemed moot in light of the court's grant of summary judgment for Boston Mutual.

In the present cross-appeals, Dolan appeals the district court's grant of summary judgment for Boston Mutual on her claims

and Boston Mutual appeals the district court's grant of summary judgment for Dolan on its counterclaim.

## II.

We review the district court's grants of summary judgment de novo.  Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 558-59 (1st Cir. 2010).  In the typical case, we will reverse a grant of summary judgment only if, making all factual inferences in favor of the non-moving party, a rational factfinder could resolve the legal issue for either side.  Cusson v. Liberty Life Assurance Co. of Boston, 592 F.3d 215, 223-24 (1st Cir. 2010).  The presence of cross-motions does not alter this general standard.  When there are cross-motions for summary judgment, the court must consider each motion separately, drawing all inferences in favor of each non-moving party in turn.  Merchants Ins. Co. of N.H., Inc. v. U.S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).

Cases that concern benefit determinations under an ERISA plan, however, are not typical cases when it comes to summary judgment.  When an ERISA plan gives an administrator discretionary authority to determine eligibility for benefits or construe the plan's terms, the district court must uphold the administrator's decision unless it is "arbitrary, capricious, or an abuse of discretion."[5]  Cusson, 592 F.3d at 224 (quoting Gannon v. Metro.

---

[5]   We have noted that "[f]or purposes of reviewing benefit determinations by an ERISA plan administrator, the arbitrary and capricious standard is functionally equivalent to the abuse of

-15-

Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004)) (internal quotation marks omitted).  In such cases, "summary judgment is simply a vehicle for deciding the issue" and "the non-moving party is not entitled to the usual inferences in its favor."  Id. (quoting Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005)) (internal quotation marks omitted).

The parties agree that the plan at issue here affords Boston Mutual authority to determine benefit eligibility and construe its terms.  Accordingly, the district court reviewed Boston Mutual's benefit determinations for abuse of discretion. Our de novo review of the district court's grants of summary judgment as they relate to benefit determinations must look to whether the district court erred in finding that Boston Mutual's determinations were within its discretion.  Our de novo review of the district court's grants of summary judgment as they relate to other issues must employ the non-deferential review typically employed on summary judgment.  See Orndorf, 404 F.3d at 517.

## III.

We address in concert the two benefit determinations relevant to this appeal, as both rest on the same stated rationale. Boston Mutual terminated Dolan's benefits because it deemed Dolan

---

discretion standard."  Wright v. R.R. Donnelley & Sons Grp. Benefits Plan, 402 F.3d 67, 74 n.3 (1st Cir. 2005).  We describe the relevant standard of review for these benefit determinations as "abuse of discretion" review.

-16-

ineligible for benefits under the plan, and it demanded recoupment of past payments made to Dolan because it deemed that Dolan had never been eligible for benefits under the plan.  It has been Boston Mutual's position that Dolan has never been eligible for benefits because her post-disability earnings have always exceeded her pre-disability earnings as defined by the plan.  There are no disputed facts concerning Dolan's income.  The parties only dispute how to interpret the plan's terms and thereby determine Dolan's eligibility for benefits in light of her income.

This interpretive dispute centers on four constructions present in the plan: "earnings," "basic annual earnings," "pre-disability earnings," and "current earnings."  Dolan argues that the plan's definition of "basic annual earnings" defines "earnings" as W-2 income and that a reasonable reading of the plan demands a consistent application of this definition, irrespective of the temporal periods "pre-disability" and "current."  It has been Boston Mutual's position that when the term "earnings" precedes the terms "pre-disability" or "basic annual" it refers to monthly W-2 income, but when the term "earnings" is used alone or combined with the term "current" it refers to all income that derives from employment, including ownership income.[6]

_____

[6]    Specifically, Boston Mutual argues that S corporation "pass through" income paid to working shareholders falls within the definition of "earnings" when the term is used in isolation or in conjunction with the term "current."  It argues that this view is consistent with case law concerning the earnings subject to federal

A.      Existing Circuit Law

In this circuit, we have held that an ERISA benefit determination is within the discretion of the plan administrator so long as it is "reasoned and supported by substantial evidence." Wright v. R.R. Donnelly & Sons Grp. Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005) (quoting Gannon, 360 F.3d at 213). We have emphasized that our review of whether a plan administrator abused its discretion does not require that we determine either the "best reading" of the ERISA plan or how we would read the plan de novo. Stamp v. Metro. Life Ins. Co., 531 F.3d 84, 94 (1st Cir. 2008) (quoting Lennon v. Metro. Life Ins. Co., 504 F.3d 617, 624 (6th Cir. 2007)) (internal quotation marks omitted). We have also noted that the doctrine of contra proferentem does not apply to review of an ERISA plan construction advanced by an administrator given authority to construe the plan. Id. at 93 (citing Morton v. Smith, 91 F.3d 867, 871 n.1 (7th Cir. 1996)).

Challenges to benefit determinations in this circuit have typically involved the application of contested facts to uncontested plan terms. In Leahy v. Raytheon Co., 315 F.3d 11 (1st Cir. 2002), for example, we noted that the relevant plan terms were

employment taxes. See Nu-Look Design, Inc. v. C.I.R., 356 F.3d 290, 291 (3d Cir. 2004); Joseph Radtke, S.C. v. United States, 895 F.2d 1196, 1197 (7th Cir. 1990); Spicer Accounting, Inc. v. United States, 918 F.2d 90, 93 (9th Cir. 1990). Boston Mutual has not argued that any other type of non-salary income deriving from employment falls into these two definitions of "earnings."

-18-

"clear and unambiguous" but that, "[a]s in many such instances," the "devil is in the details" of applying the facts to those terms. Id. at 18. Most often, plaintiffs have challenged the sufficiency of the evidence underlying an ERISA plan administrator's factual conclusions. See, e.g., Cusson, 592 F.3d at 229-30; Orndorf, 404 F.3d at 518. They have also challenged benefit determinations on the grounds that the ERISA plan administrator improperly credited certain evidence. See, e.g., Medina v. Metro. Life Ins. Co., 588 F.3d 41, 45-47 (1st Cir. 2009); Buffonge v. Prudential Ins. Co. of Am., 426 F.3d 20, 30 (1st Cir. 2005).

We are aware of only two cases decided in this circuit concerning purely interpretive questions like the one raised in this appeal. Understandably, neither of these cases articulate general guidelines as to when a plan administrator's construction is sufficiently lacking in reason that it rises to the level of an abuse of discretion. In the more recent case, Coffin v. Bowater Inc., 501 F.3d 80 (1st Cir. 2007), we upheld a plan administrator's construction because we found its construction "significantly more persuasive" than that offered by the plaintiffs. Id. at 96. In so holding, the court did not need to reach the more difficult question of when a plan administrator's construction will be sufficiently reasonable to warrant deference even though it is only as persuasive or less persuasive than the interpretation offered by the plaintiffs.

In an earlier case, <u>Kolling</u> v. <u>American Power Conversion Corp.</u>, 347 F.3d 11 (1st Cir. 2003), we held it within a plan administrator's discretion to "reasonably" construe the term "employee," which was circularly defined by the plan as "Employee of the Employer." <u>Id.</u> at 14. (citing <u>Trombetta</u> v. <u>Cragin Fed. Bank for Sav. Emp. Stock Ownership Plan</u>, 102 F.3d 1435, 1439-40 (7th Cir. 1996)). We held that the plan administrator had "permissibly looked" to the insurance company's "intention in defining the Plan's scope" and that the evidence supported its determination regarding that intention. <u>Id.</u> We also held that the insurance company had consistently applied its definition of "employee" in the past. <u>Id.</u> We did not address when these indicators or others might require a holding that a plan construction was unreasonable.

The Supreme Court has not spoken directly to how courts should assess whether an administrator's construction of a plan term is so unreasonable as to constitute an abuse of discretion. In <u>Firestone Tire & Rubber Co.</u> v. <u>Bruch</u>, 489 U.S. 101 (1989), the Court noted that "ERISA abounds with the language and terminology of trust law," <u>id.</u> at 110, and that given this, it had held that courts must develop a "federal common law of rights and obligations under ERISA-regulated plans," <u>id.</u> (quoting <u>Pilot Life Ins. Co.</u> v. <u>Dedeaux</u>, 481 U.S. 41, 56 (1987)) (internal quotation marks omitted). The Court held that "[t]rust principles make a deferential standard of review appropriate when a trustee exercises

-20-

discretionary powers," and that when a trustee is given such power "to construe disputed or doubtful terms . . . the trustee's interpretation will not be disturbed if reasonable." Id. at 111.

The Court has not given precise content to this standard. It has held that courts must consider conflicts of interest that may arise when an administrator, like Boston Mutual, "both determines whether an employee is eligible for benefits and pays benefits out of its own pocket." Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008); see also Conkright v. Frommert, 130 S. Ct. 1640, 1647 (2010). In Glenn, the Court noted that courts "will often take account of several different considerations of which a conflict of interest is one." Glenn, 554 U.S. at 117. It did not identify other relevant factors, however, and "warned against creating formulas that will 'falsif[y] the actual process of judging' or serve as 'instrument[s] of futile casuistry.'" Id. at 119 (quoting Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474, 489 (1951)) (alterations in original).

B.        Law Beyond This Circuit

In the absence of clear guidance from either this court or the Supreme Court, we look to the law of other circuits. The circuit courts have articulated the abuse of discretion standard afforded to ERISA plan administrators under Bruch in various ways. Jayne E. Zanglein & Susan J. Stabile, ERISA Litigation 550 (3d ed. 2008). We do not delve into how the circuits have formulated this

-21-

standard for all cases in which an ERISA plan administrator has power to make benefit determinations. Rather, we limit our attention to the question of when an ERISA plan administrator, acting pursuant to a grant of power to construe the plan's terms, construes the plan in a manner that is unreasonable and thus abuses its discretion.

At the outset, we note that "[i]t is notoriously difficult to venture a general definition of the term 'abuse of discretion,' and none is canonical; indeed, the term has different meanings in different legal contexts." Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 321-22 (4th Cir. 2008). As Judge Wilkinson wrote in Evans, the standard "draws a line--or rather demarcates a region--between the unsupportable and the merely mistaken, between the legal error, disorder of reason, severe lapse of judgment, and procedural failure that a reviewing court may always correct, and the simple disagreement that, on this standard, it may not." Id. at 322 (citing Harry T. Edwards & Linda Elliott, Federal Standards of Review 68 (2007)). It goes without saying that terms like "reasonable," which underlie the standard here, are similarly difficult to define precisely.

It also bears emphasis that this standard of review, which concerns a fiduciary element of the role of an ERISA plan administrator, must reflect the relevant principles of trust law, rather than the law of contracts. Matthews v. Sears Pension Plan,

144 F.3d 461, 465 (7th Cir. 1998); see also Bruch, 489 U.S. at 111. As the Supreme Court has held, trust law "can ask judges to determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together." Glenn, 554 U.S. at 117. In this context, our analysis must weigh the values advanced by ERISA in empowering plan administrators as fiduciaries, cf. Evans, 514 F.3d at 323, with the dangers policed by the statute arising from breach of fiduciary duty, cf. Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 141 n.8 (1985).

In their review of ERISA plan constructions like the one presented in this case, courts beyond this circuit have looked to the language and purpose of the plan. In some circuits, the analysis has been conducted with reference to the consistency of an administrator's construction with the "plain meaning" of the plan. See Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan, 410 F.3d 1173, 1178 (9th Cir. 2005); Wagener v. SBC Pension Benefit Plan-- Non Bargained Program, 407 F.3d 395, 404 (D.C. Cir. 2005); Pagan v. NYNEX Pension Plan, 52 F.3d 438, 443 (2d Cir. 1995); Fuller v. CBT Corp., 905 F.2d 1055, 1060 (7th Cir. 1990). These circuits have not defined how courts should determine whether an interpretation does not accord with an ERISA plan's plain meaning.

At least four circuits have advanced more specific standards. The Fifth Circuit has split the inquiry into two steps,

each of which contains three guiding factors, while the Third, Fourth, and Eighth circuits have listed a general set of guidelines.

The Fifth Circuit first asks whether an administrator's interpretation is "legally correct." Chacko v. Sabre, Inc., 473 F.3d 604, 611 (5th Cir. 2006). In so doing, it considers "(1) whether the administrator has given the plan a uniform construction; (2) whether the interpretation is consistent with a fair reading of the plan; and (3) any unanticipated costs resulting from different interpretations of the plan." Id. If the interpretation is "legally correct," it must stand; if it is not, the court considers three factors to determine if it is an abuse of discretion: "(1) the internal consistency of the plan under the administrator's interpretation, (2) any relevant regulations formulated by the appropriate administrative agencies, and (3) the factual background of the determination and any inferences of lack of good faith." Gosselink v. Am. Tel. & Tel., Inc., 272 F.3d 722 (5th Cir. 2001).

The Third, Fourth, and Eighth circuits each employs a multi-factor test to determine whether a plan construction constitutes an abuse of discretion. The Third and Eighth circuits each considers the following five factors:

> (1) whether the administrator's language is
> contrary to the clear language of the plan;
> (2) whether the interpretation conflicts with
> the substantive or procedural requirements of

ERISA; (3) whether the interpretation renders any language of the plan meaningless or internally inconsistent; (4) whether the interpretation is consistent with the goals of the plan; and (5) whether the administrator has consistently followed the interpretation.

Manning v. Am. Republic Ins. Co., 604 F.3d 1030, 1041-42 (8th Cir. 2010); see also Howley v. Mellon Fin. Corp., 625 F.3d 788, 795 (3d Cir. 2010). The Fourth Circuit's "non-exhaustive" list of factors includes these five factors as well as "whether the decisionmaking process was reasoned and principled," "any external standard relevant to the exercise of discretion," and "the fiduciary's motives and any conflict of interest it may have." Carden v. Aetna Life Ins. Co., 559 F.3d 256, 261 (4th Cir. 2009).

C.        Boston Mutual's Construction of the Plan

Although these standards are instructive, we do not adopt them or any specific guiding factors. With all due deference to Boston Mutual's role as a fiduciary, it is clear that its construction of the ERISA plan at issue stretches beyond the bounds of reasonableness. This is so for a number of reasons, which are specific to the particular case at hand.

As an initial matter, Boston Mutual's construction of the term "earnings" cannot be applied consistently within its own account of the plan's meaning. It has been Boston Mutual's position that the term "earnings" refers to W-2 income when it is used in conjunction with the terms "pre-disability" or "basic annual." It has also been Boston Mutual's position that the term

-25-

"earnings" refers to all income deriving from employment when it is used alone or with the term "current." Yet the plan's express definitions of "pre-disability earnings" and "basic annual earnings" cannot support both of these positions at once.

The plan expressly defines "pre-disability earnings" as well as "Basic annual Earnings" with reference to the unaccompanied term "earnings." The plan defines "pre-disability earnings" as "your monthly rate of _earnings_ from the employer in effect just prior to the date disability begins." (Emphasis added.) It defines "Basic annual Earnings," in turn, as "the Insured Person's earnings for the prior calendar year as reported by the Group Policyholder on form W-2, excluding commissions. If the person has earnings for less than a calendar year, Basic Annual Earnings shall be determined by averaging the monthly _earnings_ for each month worked and annualizing the result." (Emphasis added.)

If Boston Mutual's definition of the unaccompanied term "earnings" were applied to that unaccompanied term as used _within_ the plan's stated definitions of "pre-disability earnings" and "basic annual earnings," the term "earnings" would have to refer to both W-2 income and non-salary income when used in conjunction with the terms "pre-disability" and "basic annual." If, on the other hand, one accepts Boston Mutual's definition of "earnings" as used in conjunction with "pre-disability" and "basic annual," then the definition of the unaccompanied term "earnings" as used _within_ the

plan's definitions of "pre-disability earnings" and "basic annual earnings" would have to refer only to salary income.

Boston Mutual attempts to counter this contradiction by invoking the broader structure of the plan. It argues that "the clear import" of the plan "is to reduce and potentially eliminate benefit payments once the claimant earns enough money from other sources of income." In support of this claim, Boston Mutual points in particular to the plan's provision that benefits may be limited by a participant's receipt of "other income amounts," a term the plan defines, inter alia, as "[a]ny income you earn or receive from any form of employment." Boston Mutual argues that its various constructions of the term "earnings," notwithstanding the definitions at the beginning of the plan, are consistent with the plan's effort to take account of income from employment.

Specifically, Boston Mutual relies on language concerning benefit termination. The plan states that if an employee covered by the plan is "disabled and working, earning more than 80% of [his or her] pre-disability earnings, no payment will be made," and payments will stop "the date [the covered employee's] current earnings exceed 80% of [his or her] pre-disability earnings." (Emphasis added.) Boston Mutual argues that these provisions only allow payment of benefits when the sum of a covered employee's W-2 income and non-salary income from employment is at least 20% less than that individual's pre-disability W-2 income. The benefit

formula, which sets payment amounts for those "earning" at least 20% less than their "pre-disability earnings," mirrors this requirement under Boston Mutual's construction.

This argument elides clear divisions within the plan's structure that distinguish between questions of benefit calculation and questions of benefit eligibility. The plan employs the term "earnings," in combination with various other terms, in its provisions governing whether a payment can be made. In addition to the provisions upon which Boston Mutual relies, the plan limits eligibility for benefits in its definition of disability to individuals who have "at least a 20% loss in [their] pre-disability earnings." The plan employs the term "income," by contrast, in its provisions governing the size of payments due to qualified individuals. These provisions might plausibly reduce the size of a benefit payment to zero,[7] but they are distinct from provisions concerning who is qualified to receive a payment.

Not only do "earnings" and "income" occupy different domains of the plan; Boston Mutual has also construed these terms quite differently. Depending on the context, Boston Mutual construes "earnings" to mean either W-2 income or both W-2 income

---

[7]    The plan identifies a "minimum payment" amount, which might be read to ensure a baseline payment for individuals that meet benefit eligibility requirements but would receive a payment of zero under the benefit calculation formula. Neither party has invoked this provision, however, and we need not address it further.

and non-salary income deriving from employment.[8]  As expressly

defined within the plan, "other income amounts" extend beyond both

of these definitions of earnings.  In its definition of "other

income amounts," the plan includes "any income you earn or receive

from any form of employment."  It also includes a variety of

benefits and awards received under employment plans and government

programs.  For example, the plan lists Social Security benefits due

to disability or retirement, benefits received under workers'

compensation, and sick leave benefits.

Boston Mutual's interpretation also renders meaningless

the only provision in the plan that appears to define "earnings" in

a substantive way.  The plan defines "Basic annual Earnings" with

reference to W-2 earnings; elsewhere, the plan is silent as to what

counts as earnings.  The plan's express definition of "pre-

disability earnings" does not mention W-2 earnings, and Boston

Mutual has not explicitly explained why it has construed the term

"earnings" to mean W-2 income when it is used with the term "pre-

disability."[9]  Under Boston Mutual's construction of the plan, the

_____

[8]    Boston Mutual cites a series of dictionary definitions
for the proposition that its definition of "earnings" when the term
is either unaccompanied or accompanied by the term "current" falls
within ordinary usage.  Although some of the dictionary definitions
refer to "earnings" as all income deriving from labor and capital,
Boston Mutual does not assert that its definition of "earnings"
stretches this broadly.

[9]    The most logical textual source for this construction of
the term "earnings" when used with the term "pre-disability" is the
definition of "Basic annual Earnings."  The plan defines "pre-

-29-

definition of "Basic annual Earnings" is only relevant to that particular phrase. Yet the phrase does not appear once in the plan outside the provisions that define it.

Boston Mutual makes a further structural argument that its construction avoids a difficulty that would arise if the plan were construed to define "earnings" as W-2 income. It argues that if earnings were construed in that manner, principals like Dolan could inflate their benefit payments by reclassifying their W-2 income as non-salary income. The plan expressly avoids this purported difficulty, however. It provides that an individual will no longer receive benefits if he or she is "able to increase [his or her] current earnings by increasing the number of hours [he or she] work[s] or the number of duties [he or she] perform[s] in [his or her] regular occupation but . . . does not do so." This provision would allow Boston Mutual to terminate the benefits of individuals who attempted to increase their benefits in this fashion.

It is also instructive that Boston Mutual, though indisputably in possession of all of Dolan's tax forms at all times relevant to this suit, did not advance its present construction of the plan until more than four years after it began paying Dolan

---

disability earnings" with reference to the insured's "monthly rate of earnings," however, not "basic annual earnings." Thus, this construction would suggest that "Basic annual Earnings" defines "earnings" generally, which is not Boston Mutual's position.

benefits. Boston Mutual does not dispute that Dolan's tax forms made clear that she was a principal of D&H and Associated Professional Management, Inc., and received income in these capacities. When Dolan filed her initial claim for benefits, Boston Mutual apparently did not consider this other income stream to preclude eligibility.[10]

If Boston Mutual wanted to offer a plan that determined benefit eligibility by comparing pre-disability W-2 income with post-disability income deriving from employment, it could have drafted a plan that made this clear. Boston Mutual may not transform an existing plan to achieve this end by construing it in a fashion contrary to its terms. In light of the foregoing, we hold that Boston Mutual's construction of the plan was unreasonable and, therefore, that its determination that Dolan has never been eligible for benefits constituted an abuse of discretion.[11]

---

[10] We do not reach Boston Mutual's argument that we may not consider the contents of the four contested affidavits, which contain additional factual claims concerning the consistency of Boston Mutual's construction of the plan. The contents of these affidavits are not necessary to our holding.

[11] We have considered the arguments as to whether Boston Mutual has taken adequate measures to "insulate [its] decisionmaking process against the potentially pernicious effects of structural conflicts" of interest, Denmark v. Liberty Life Assurance Co. of Boston, 566 F.3d 1, 9 (1st Cir. 2009), and they do not alter our conclusion.

IV.

Our holding that Boston Mutual abused its discretion in determining that Dolan has never been eligible for benefits requires an entry of judgment for Dolan on both her wrongful denial of benefits claim and Boston Mutual's counterclaim for recoupment of past payments. We <u>affirm</u> the entry of judgment for Dolan on Boston Mutual's counterclaim on the different ground that Boston Mutual's determination that it overpaid benefits was an abuse of discretion. We <u>reverse</u> the district court's entry of judgment for Boston Mutual on Dolan's wrongful denial of benefits claim and remand to the district court with instructions to enter judgment for Dolan, subject to the provisos in this opinion.

So ordered.